## Frick Estate

*Smith, Buchanan, Ingersoll, Rodewald & Eckert,* for accountant.

*Ralph D. McKee* and *Alter, Wright & Barron,* for remaindermen.

*Moorhead & Knox,* for Childs Frick.

RAHAUSER, J., January 5, 1955.—Henry C. Frick died a resident of Pittsburgh, Pa., December 2, 1919. His last will and testament was duly probated in the Register of Wills Office of Allegheny County, Pa. By his will testator created various trusts. Among them was one created for the benefit of Frances Dixon Frick. Section 12 of article I, which creates this trust, provides as follows:

"If Frances Dixon Frick, the wife of my said son Childs Frick shall survive me, but not otherwise, I Give and Bequeath to the Union Trust Company of Pittsburgh, of the City of Pittsburgh, Pennsylvania, as Trustee, the sum of Two Million Dollars, in Trust, to invest and reinvest the same and to collect and receive the income thereof, and after paying the expenses of the trust, including a reasonable compensation to the said trustee, to pay and apply the residue of said income unto the use of the said Frances Dixon Frick during her natural life, and In Further Trust upon her death to assign, transfer and deliver the said trust fund, and I Hereby Give and Bequeath the same, unto such of the issue surviving her of her marriage with my said son, and in such interests and proportions, as she shall in and by her last will and testament in that behalf direct, limit and appoint, and in default of such appointment, then equally to and

among such surviving issue, and if the said Frances Dixon Frick shall leave her surviving no issue of said marriage, then to such persons and in such interests and proportions as she shall in and by her last will and testament in that behalf direct, limit and appoint.

"If the said Frances Dixon Frick shall die before me and my said son Childs Frick shall survive me, then and in such event I Direct that the said sum of Two Million Dollars shall be added to the trust created in and by the ninth section of the Article of my will for the benefit of my said son and remaindermen.

"If neither my said son nor the said Frances Dixon Frick shall survive me, then and in that event I Direct that the said sum of Two Million Dollars shall be added to the trust created by the eleventh section of this Article of my will for the benefit of the children and issue of my said son and remaindermen."

Frances Dixon Frick, the life beneficiary, died August 5, 1953, a resident of Rosslyn, Nassau County, N. Y. She left to survive her four children, Adelaide Frick Blanchard, Frances Frick Burden, Martha Frick Symington and Henry Clay Frick, 2nd, all of whom are sui juris and are the remaindermen of the aforesaid trust.

Letters testamentary on her estate were granted by the Surrogate of the County of Nassau, State of New York, to Childs Frick, her husband; Henry Clay Frick, 2nd, her son, and the Mellon National Bank and Trust Company.

Frances Dixon Frick, by article 14 of her will, declined to exercise the power of appointment given to her under the will of her father-in-law, Henry C. Frick. By reason thereof the trust fund is now distributable to the remaindermen above named, under the aforementioned article I, sec. 12, of the will of Henry C. Frick, deceased.

250

The Mellon National Bank and Trust Company, trustee for Frances Dixon Frick, filed its first and final account as such trustee on September 3, 1954.

The accounts show certain securities received into the trust that were held by Henry C. Frick during his lifetime. The will of Henry C. Frick authorized his executor to pay any legacy in cash or in securities. Article IX of the will gave the executors the power to distribute the securities as follows:

"My said executors are authorized, in their discretion, to pay any pecuniary legacy given by this will, whether in trust or otherwise, either in cash or in securities to be selected by them out of my estate and at such value as they in their judgment shall determine, or partly in cash and partly in such securities as they shall think best."

It further appears that the executors under the will of Henry C. Frick were charged with establishing these trusts. There was a special provision for income to the beneficiaries from the date of death until the establishment of the trust. Section 15 of article I provides:

"I Direct that the income of all trusts created by this Article of my will shall be deemed to accrue for the benefit of the beneficiary from the date of my death, and pending the administration of my estate and until the respective trust funds are established, I Direct my executors from time to time to pay from my general estate to the beneficiary of each trust such sum as in their judgment they shall determine to be equivalent to the income which the trust fund for the benefit of such beneficiary would probably have produced during such period had the same been invested."

It appears from the record that the particular securities with which we are here concerned, to wit, Pittsburgh Plate Glass Company, were delivered to the trustee April 11, 1922.

The record shows, that by virtue of the aforementioned article IX of the will, the executors, acting under their discretionary authority therein provided, distributed 1,538 shares of the Pittsburgh Plate Glass Company stock at a value of $130 per share to the trustee for Frances Dixon Frick et al. The carrying value to the trustee as of April 11, 1922, was $199,940. The book value of this same stock on that date was $158 per share, or a total amount of $243,004.

The aforementioned account shows certain stock dividends were received by the trustee from time to time on the stock. A stipulation filed by the parties gives the details of the history of this stock during the trusteeship. The salient matters are recited in paragraphs 5 to 14 inclusive as follows:

"5. As of the record date January 29, 1923, Pittsburgh Plate Glass Company, hereinafter called 'the corporation', paid a 30 percent stock dividend pursuant to which the trustee received a dividend of 461.4 shares, thus increasing the total holdings of the trust to 1,999.4 shares. Immediately after this stock dividend, the book value per share was $129.13. This is an event requiring an apportionment.

"6. On February 23, 1923, the trustee sold 0.4 of a share for the sum of $70.96. The book value on that date was $130.07 per share. This is an event requiring an apportionment.

"7. As of the record date October 9, 1928, the corporation split its stock on a 4-for-1 basis, issuing four shares of the par value of $25 per share in exchange for each of the old shares of $100 par value. As a result of this split, the trustee received 7,996 new shares in exchange for its 1,999 old shares. This is *not* an event requiring any apportionment, since it involves merely a reclassification of the capital stock without any capitalization of corporate earnings.

"8. As of the record date November 15, 1928, the corporation paid a 10 percent stock dividend pursuant to which the trustee received a stock dividend of 799.6 shares, thus increasing its holdings to 8,795.6 shares of the par value of $25 per share. Immediately after this stock dividend the book value per share was $39.86. This is an event requiring an apportionment.

"9. On December 11, 1928, the trustee purchased 0.4 share at a cost of $27.65, thus increasing its holdings to 8,796 shares. The book value of said 0.4 share on December 11, 1928, was $16.01. This is *not* an event requiring any apportionment, but the intact value must be increased to compensate for this acquisition.

"10. The corporation sold new stock to the public in 1939 at prices in excess of par, resulting in an increase of $1,814.94 in the contributed surplus of the corporation applicable to the corpus.

"1. In December 1940 the trustee sold a total of 2,950 shares, thus reducing the holdings of the trust to 5,846 shares of the par value of $25 per share. The dates and amounts of such sales, the net proceeds thereof and the book value per share on the date of the respective sales are as follows:

| "Date of Sales | Number of Shares Sold | Net Proceeds | Book Value Per Share |
|---|---|---|---|
| December 18, 1940 | 400 | $36,386.74 | $48.55 |
| December 18, 1940 | 200 | 18,268.47 | 48.55 |
| December 20, 1940 | 300 | 27,115.37 | 48.55 |
| December 23, 1940 | 400 | 35,316.03 | 48.56 |
| December 24, 1940 | 500 | 43,914.35 | 48.56 |
| December 26, 1940 | 550 | 47,888.23 | 48.56 |
| December 27, 1940 | 600 | 52,186.17 | 48.57 |

"Each of these sales is an event requiring an apportionment but for convenience in apportionment they may be collectively regarded as a single sale and

for such purpose the book value on the date of sale may be deemed to be $48.56 per share, being the average book value during the 10-day period covered by the sales.

"12. During 1944 and 1945 the corporation sold new stock for prices in excess of par, resulting in an increase in the contributed surplus of the corporation of $0.19806 per share applicable to the stock outstanding immediately prior to the 1945 split.

"13. As of the record date December 15, 1945, the corporation split its stock on a 4-for-1 basis, issuing four shares of the par value of $10 each in exchange for each of the old shares of the par value of $25, pursuant to which the trust received 23,384 shares of the new stock in exchange for its 5,846 shares of the old stock. The difference between the old $25 par value and the aggregate par value of $40 of the new stock given in exchange represented a capitalization of earned surplus. Thus of the corpus shares received in this split, five eighths thereof represented simply a reclassification of the capital account of the corporation not requiring any apportionment and the remaining three eighths was the equivalent of a stock dividend requiring an apportionment. Immediately after the 1945 split, the book value per share was $14.25.

"14. From the inception of the trust in 1922 until the death of the life beneficiary in 1953, the trustee has rendered monthly income statements and semiannual corpus statements to the life beneficiary showing the various transactions of the trust, including the receipt of stock dividends and the sales of stock made from time to time. The trustee consulted the life beneficiary about the proposed sales made in December 1940, and the life beneficiary approved the proposed sales. There was no understanding or discussion between the trustee and the life beneficiary as to

whether the said sales should be made from income stock or from corpus stock."

A supplemental stipulation, as follows, was filed by counsel of record:

"1. The records of the trustee show that the stock dividends on the Pittsburgh Plate Glass Company capital stock paid in the years 1923 and 1928 were treated as part of the corpus of the trust estate. In the statements furnished to the life beneficiary for the semiannual periods in which said transactions occurred, said stock dividends were shown as part of the corpus and no change in respect of said treatment was shown in any subsequent statements."

The questions arising in connection with this audit as stated are:

1. Are all parties and interests duly represented?

2. When was the trust established?

3. What was the intact value of the shares of Pittsburgh Plate Glass Company stock in the trust?

4. Were the securities identified in paragraph 11 of the stipulation sold from corpus or income?

The remaindermen under the trust, as previously stated, are Adelaide Frick Blanchard, Frances Frick Burden, Martha Frick Symington and Henry Clay Frick, 2nd. All are sui juris and all are represented by competent counsel on the record.

The parties interested in the dividends that were properly apportionable to Frances Dixon Frick during the lifetime of the life tenant are the executors of the estate of Frances Dixon Frick. They represent the interests in posse under the will of Frances Dixon Frick.

The Mellon National Bank and Trust Company is acting in a dual capacity; it is the trustee that stated the account now being audited and it is one of the three executors of the estate of Frances Dixon Frick, deceased, life tenant under the trust.

Henry Clay Frick, 2nd, is a remainderman under the trust and as such his interests are adverse to those of the estate of Frances Dixon Frick, deceased, life tenant under the trust, with particular reference to the proper apportionment of stock dividends received by the trustee.

Henry Clay Frick, 2nd, is also one of the executors of the estate of Frances Dixon Frick, deceased life tenant, as aforesaid. His interests individually are adverse to his interest as executor as to the apportionment of the stock dividends.

Childs Frick, the third executor of the estate of Frances Dixon Frick, deceased life tenant as aforesaid, is not one of the remaindermen under the aforesaid trust. He has no individual interest in conflict with his duties as such executor. It is his duty to assert the rights of the estate of Frances Dixon Frick, the deceased life tenant, in the matter of the apportionment of the stock dividends. He is represented by competent counsel who have notified the trustee of their claim on behalf of the estate of the deceased life tenant. Such claims are presently before this court for adjudication in connection with the aforesaid account of the trustee.

The court is of the opinion that all parties in interest are properly before the court, for the reason that there is a disinterested executor of the estate of Frances Dixon Frick, deceased, in court representing all parties in interest in the estate and the remaindermen under the trust have been notified of this proceeding and are represented herein by counsel. Under these circumstances there is no need for the appointment of a guardian ad litem or a trustee ad litem.

This court holds that insofar as this account is concerned the trust was established April 11, 1922. In this particular the account being audited is different from those involved in cases reported in our Supreme

Court. Here neither the trust nor its beneficiaries had any interest in the particular block of stock until the date when the executors allotted the securities to the trustee in lieu of cash. Here the executors had both the duty to establish the trust and the power to allot securities in lieu of cash. In the Flinn's Estate, 310 Pa. 206, the subject matter of the trust was a share of the residuary estate. In Waterhouse's Estate, 308 Pa. 422, and other cases wherein the Supreme Court has ruled that the book value to be considered is that as of the death of testator, the shares came into the trust directly from the settlor. In the case before the court the Pittsburgh Plate Glass Company paid a dividend between the time testator died and the time when the securities were allotted to the trust.

The court is of the opinion that testator intended the trust to be established when securities were allotted and that this intent is evidenced by his words used in the aforementioned sections of the will.

In considering the value that must be allocated to each share of Pittsburgh Plate Glass Company stock, counsel for Childs Frick, one of the executors of the estate of Frances Dixon Frick, urges that, inasmuch as the carrying value of the Pittsburgh Plate Glass Company stock to the trustee was $130 per share as of April 11, 1922, the value of $130 per share should be used. He contends that the intact value of the securities is determined by the principle laid down in Scott on Trusts, vol. 2, page 1310. There the text writer states:

"Where the stock was not received from the settlor but was subsequently purchased by the trustee for the trust, the intact value is the purchase price rather than the book value at the time of the purchase."

Counsel for the remaindermen contend that the book value as of April 11, 1922, must be used in arriving at the intact value of each share of Pittsburgh

Plate Glass Company stock. He cites certain decisions of the Supreme Court that will be discussed hereafter.

The court is of the opinion that the allotting of the securities by the executors is not in the nature of a purchase, that the intact value of the securities allotted was the book value as of the date of the delivery to the trustee, to wit, $158; further, that the life tenant has no interest in the difference between the carrying value of $130 per share and the intact value of $158 per share.

Three fundamental principles are well settled in the application of the Pennsylvania Rule of Apportionment: (1) The maximum which the life beneficiary is entitled to receive is her share of the corporate earnings accrued since the stock became subject to the trust; (2) intact value is to be fixed at the book value at the time the stock became subject to the trust, and (3) market value has been flatly rejected as a factor in determining the proper apportionment.

In the leading case of Nirdlinger's Estate, 290 Pa. 457, 463, 464 (1927), the court, in an exhaustive opinion by Mr. Justice Kephart, said:

"Under the Pennsylvania or American Rule, adopted in most American jurisdictions, the rights of the life tenant and the remainderman to an extraordinary cash or a stock dividend declared during the life tenancy are determined by a division of the dividend between the claimant *so as to preserve intact the book value* of the devised property (the corpus) as it existed at testator's death. This was made clear by the decision in Earp's App., 28 Pa. 368, long recognized as a leading authority. *The effect of the rule is to give to the life tenant the income which has been earned since the trust came into being,* but, at the same time, to preserve the value of the corpus as it was at the date of the death of the testator, or, to use a more convenient term, to preserve the intact value of the es-

tate. This intact value includes the par value of the stock plus any accumulation of income earned before the death of the testator: Earp's App., supra."

In Packer's Estate (No. 1), 291 Pa. 194, 196, 197 (1927), Mr. Justice Simpson stated the rule as follows:

". . . in distributing extraordinary stock dividends between a life tenant and the corpus of a trust which holds the original stock upon which the dividend is declared, the former is entitled to receive so many of the new shares *as represents the net earnings of the corporation accruing after the trust estate acquired the stock* upon which the dividend was declared, for they then represent the accrued income; the latter is entitled to retain all the rest of the stock dividend, for it does not represent income. *Neither market value, nor any other value than the actual or intact value of the shares, is of any moment in determining how such a distribution is to be made.*"

In Baird's Estate, 299 Pa. 39, 42 (1930), the court, in an opinion by Mr. Justice Kephart, said:

*"Market value has been eliminated as a standard of measurement:* Packer's Est. (No. 1), 291 Pa. 194, 197; Jones v. Integrity Trust Co., 292 Pa. 149, 155. We have stated indiscriminately in our decisions that intact value is actual, intrinsic, liquidating or book value, but the customary standard of measurement used in the case is book value. *The prima facie standard of measurement of intact value of trust estates, the income of which is to be paid to a beneficiary, with remainder over, is the book value;* and this standard remains fixed unless it can be established that the elements making up the book value are not true values."

In Waterhouse's Estate, 308 Pa. 422, 430 (1932), in an opinion by Mr. Justice Kephart, the court said:

"In all cases, in determining the share which the life tenant is to receive based on apportionment, his

share is limited to such an amount as is attributable to income or can be fairly included therein."

In King Estate, 361 Pa. 629, 635, 636 (1949), in an opinion by Mr. Justice Horace Stern, the court said:

"The necessity of preserving intact value does not mean a preservation in the sense of the estate's actually obtaining the amount of that intact value in cash, but only a *preservation of its book value; intact value and market value are, for this purpose, wholly unrelated;* many stocks sell on the market for less than one-tenth of their book values, while other stocks, especially if speculative in nature, sell for many times their book values; the value of a stock in the market depends upon a myriad of factors other than the actual inventory value of the company's assets as reflected in the books of the corporation. Thus, while the intact value of the Jones & Laughlin common stock at the time of testator's death was $158.80 a share, the stock had nothing like that value in cash on the market, and that a like discrepancy between market value and book value existed when the stock was sold is obvious from the fact that the price realized of $21.67 per share was far less than the book value at that time."

In the light of these principles we think that the intact value of the Pittsburgh Plate Glass Company stock to be preserved is the book value of $158 per share as of April 11, 1922.

The final question relates to the sale of Pittsburgh Plate Glass Company stock. Were said sales from corpus or were they proportionally from corpus and from those that belong to the life tenant?

There was no understanding or discussion between Frances Dixon Frick and the trustee as to whether the sales of the stock should be made from corpus or dividends belonging to the life tenant. The presumption was that she was entitled to all stock dividends: Nirdlinger's Estate, 290 Pa. 457.

There is no question that the trustee was not authorized to sell her stock. The trustee doubtlessly knew that there was an apportionment due. In Wallace Estate, 99 Pitts. L. J. 289, 291, it was said:

"The remaining question relates to apportionment of the proceeds resulting from the sale on September 11, 1946, of 300 shares for $10,920.65. Although not discussed by the parties, the underlying problem is to determine whose shares were sold.

"Although the burden is ordinarily on the life tenant in apportionment cases (Waterhouse's Estate, 308 Pa. 422, 429), a trustee cannot always say that he is free from responsibility in such regard. If any 'unusual circumstance' in the extraordinary receipt suffices to put him on notice he cannot bury his head in the sand and avoid all burden (Opperman's Estate (No. 1), 319 Pa. 455). As holder of this stock the trustee here knew that the corporation was changing its capital structure by transferring from earned surplus the sum of $15.00 as to each share then outstanding. Upon receipt of four new $10.00 par shares for each $25.00 par share on December 15, 1945, the trustee was well aware of the clearly apparent 'unusual circumstance'. It was bound to know that some portion of the 800 shares constituted income and should go as such (see also Bard's Estate, 339 Pa. 433, 437)."

The presumption is that the trustee would only do that which he was authorized to do. He had authority to sell corpus stock by virtue of the trust instrument. He had no authority to sell the property of the life tenant.

This court is, therefore, of the opinion that all sales must be considered as that of the corpus.

A decree will be drawn in accord with this opinion.