Pew Trust.

Argued November 11, 1959. Before Jones, C. J., Bell, Musmanno, Jones, Cohen, Bok and McBride, JJ.

*Oscar M. Hansen,* with him *Samuel W. Morris, Vernon L. Stover, John Russell, Jr.,* and *Morgan, Lewis & Bockius,* for life tenant, appellant.

*H. Ober Hess,* with him *Bruce L. Castor, Norman H. Brown,* and *Ballard, Spahr, Andrews & Ingersoll,* for adult contingent remaindermen, appellees.

*M. Paul Smith,* guardian ad litem for minor contingent remaindermen and trustee ad litem for unascertained persons, appellee.

OPINION BY MR. JUSTICE BENJAMIN R. JONES, March 15, 1960:

This appeal presents a problem in the field of apportionment; does a common stock distribution in 1954 by the Sun Oil Company to its stockholders, including this trust, unaccompanied by a contemporaneous capitalization of earnings, constitute an apportionable event under the Pennsylvania Rule of Apportionment?

On June 2, 1932, Mary C. Pew created an inter vivos trust to which she transferred 40,000 shares of the common stock of the Sun Oil Company (herein called Company).[1] Under the provisions of the trust instrument the settlor actually created two trusts, one for her grandson, Arthur E. Pew, Jr., and the other for her grandson, Walter C. Pew, each trust having an original corpus consisting of 20,000 shares of the Company's common stock.[2] Each grandson is to receive the net income from the corpus of his trust during his lifetime; upon the death of a grandson, the net income from the corpus of his trust is to be paid to his child or children until the child or children reaches the age of 24 years. Distribution of the corpus is to be made to each grandson's child or children in three stages:

---

[1] This same trust was considered by our Court in *Pew Trust,* 362 Pa. 468, 67 A. 2d 129, wherein we held that the provisions of the Uniform Principal and Income Act of May 3, 1945, P. L. 416, 20 PS §3471 et seq. and the Principal and Income Act of July 3, 1947, P. L. 1283, 20 PS §3470.1 et seq., if applied *retroactively* to this trust created prior to the passage of such legislation, would be unconstitutional.

[2] By decree of the Orphans' Court of Montgomery County dated February 18, 1949, the trustees were permitted to divide the corpus of the trust into two separate trusts.

twenty percent at age 24, thirty percent at age 28 and the balance of fifty percent at age 32. In the event a grandson dies without child or children surviving, then the trust provides for a gift over to the child or children of the other grandson and, in the event both grandsons die without child or children surviving, then a gift over to charity is provided. That which now commands our attention is the trust created for the grandson, Arthur E. Pew, Jr.

When the trustees filed their second account of the administration of this trust, the life tenant, Arthur E. Pew, Jr., filed several objections thereto; the only objection presently relevant is that the trustees failed to apportion to income 6359.75 shares of the common stock of the Company received by the trustees on December 30, 1954 and that such shares were carried in principal. The Orphans' Court of Montgomery County dismissed this objection and entered a decree nisi; exceptions filed thereto were dismissed by a final decree entered July 2, 1958. From that decree the life tenant appeals.

An adequate understanding of the instant problem requires a brief recital of some of the Company's financial background with particular reference to the past history of the Company's common stock distributions as related to the Company's earnings.

Prior to May 26, 1925, the Company had an authorized capital stock of 320,000 shares having a par value of $100 per share. By appropriate corporate action taken on that date, this stock was changed from par value to no par value stock, provisions were made for the issuance of three no par value shares of stock to each stockholder in place of each share of $100 par value stock previously held and authority was granted to increase the number of authorized shares of stock over and above the number necessary to accomplish

this change, the directors being empowered to fix the consideration for any remaining unissued shares which might be later issued. As a result of this action the Company then had outstanding 960,000 shares of no par value stock and its books reflected a capital of $32,000,000 equal to $33.33 per share, an amount considered by the Company as the "capital value" of each share of its stock.

Prior to 1948, the Company annually—with the exception of 1931, 1938, 1939, 1942, 1943 and 1946—declared a $1 cash dividend and a stock dividend, the book value of the latter being equal to or greater than the cash dividend. From 1925 to 1946 inclusive, the Company contemporaneously with the declaration of each stock dividend, transferred on its books from earned surplus to the capital stock account amounts equal to the established "capital value" of $33.33 per share.

Coincident with the payment of a stock dividend on January 1, 1948, the Company instituted a policy of compliance with a rule of the New York Stock Exchange (herein called Exchange) which required, as a requisite for Exchange listing of the stock, that any distribution of stock, wherein the number of new shares issued is less than twenty-five percent of the outstanding shares (that is, of the class with respect to the new shares distributed), must be capitalized by a transfer on the corporate books from the earned surplus to the capital account of the "fair market", rather than the "book", value of the new shares. This rule of the Exchange further provides that: (a) in stock distributions of twenty-five to one hundred percent it is presumed that no capitalization is necessary and (b) in stock distributions greater than one hundred percent no capitalization is required.

Prior to 1948, the stock dividends issued by the Company had been capitalized at approximately $33.33

per share; as a result, the Company was enabled to retain most of its earnings and, at the same time, through the medium of stock dividends, make available a large proportion of such earnings to its stockholders. As a result of the Exchange rule which required capitalization at "fair market" value, the policy of the Company had to be changed since the "fair market" value of the shares was consistently higher than the "book" value of the shares.[3] Consequently, in the post 1948 period smaller stock dividends were declared even though the amount of the earned surplus capitalized per dividend was larger, and the stock dividends did not distribute the full amount of the earnings capitalized.

Prior to 1954 the instant trust owned 25,439 shares of the common stock of the Company and at that time the total capitalization of the Company in excess of the "book" value of the shares was $44,674,626.

In 1954 the Company's directors adopted the following resolution: ". . . the Board of Directors . . . declare that it is advisable that each four (4) shares of Common Stock, without nominal or par value, now issued and outstanding, shall be equal to and are hereby changed into five (5) shares of Common Stock, without nominal or par value, and the holders of said Common Stock, without nominal or par value, now outstanding, shall be entitled to receive one (1) additional share of said Common Stock, without nominal or par value for each four (4) shares of Common Stock held . . . ." After stockholder approval of this resolution, the directors adopted another resolution: ". . . the additional shares of Common Stock, without nominal or par value, to which holders of said Common Stock are entitled as

---

[3] The differential between "fair market" and "book" value was: 1948-$12.00; 1949-$16.67; 1950-$18.67; 1951-$26.75; 1952-$40.67; 1953-$51.67.

a result of the split-up of said Common Stock . . . [shall] be issued on December 30, 1954 to common stockholders of record . . . November 29, 1954 . . . ."[4] (Emphasis supplied.) In connection with the issue of these additional shares no transfer was effected on the corporate books from earned surplus to the capital stock account. As a result of this corporate action this trust received 6359 additional shares of the common stock and a scrip certificate representing a 75/100th share.

If this 1954 stock distribution was a "stock split"[5] it did not constitute an apportionable event. Appellant's attempt at an equation of a "stock split" and a "stock dividend" in that both result in a "proliferation" of book value was well answered by the court below: "It must be conceded that the income beneficiary's example outlined above does illustrate that the stock split effects, in a sense, a division of earnings from the stockholder's point of view. However, this result does not appear to be the type of division and distribution of earnings contemplated by the apportionment cases. After the occurrence of the stock split the earnings of a corporation remain intact in an accumulated earnings account, undisturbed, unaltered, and available for future stock dividends or cash dividends. It is true that more shares of stock represent these identical

---

[4] Appellant argues that the purpose of this stock distribution was to make the "overcapitalization" caused by the Exchange rule available to the stockholders in tangible form; that, since the Exchange rule presumed that new shares need not be accounted for by a capitalization if the new shares represent twenty-five percent or more of the outstanding shares, the Company, for the purpose of effecting a distribution of the amounts previously "overcapitalized", without further capitalization, determined upon this method "to make the earnings available to stockholders in tangible, readily marketable form."

[5] The Company termed the transaction a "five for four split". But see: *Nirdlinger's Estate*, 290 Pa. 457, 472, 139 A. 200.

earnings after a stock split has occurred; but it is only the stock certificates representing the earnings that undergo a split or division, and not the earnings themselves." A substantial and conclusive difference exists between a "stock split" and a "stock dividend": in the former, a division of the shares of stock, not of the earnings or profits of the corporation, takes place without any change in or impingement upon the then existing status on the corporate books of the earned surplus and capital accounts; in the latter, an addition of shares of stock and a division of, at least, some of the earnings or profits of the corporation take place, such division being reflected on the corporate books by an irreversible allocation of corporate funds from the earned surplus to the capital account.[6] Although this Court has not directly passed (Cf: *Jones Estate,* 377 Pa. 473, 105 A. 2d 353) upon the apportionability of a "stock split", the rationale which justifies an apportionment between a life tenant and a remainderman is conspicuously absent in a "stock split" situation, i.e., a division of corporate earnings and profits. In *Nirdlinger's Estate,* supra, p. 473, we approved the following language in *U. S. Trust Co. v. Heye,* 224 N. Y. 242, 120 N.E. 645, 648: "The fundamental principle involved in these questions is whether there has been a distribution or division of the earnings, profits or accumulations of the corporation. Until there has been such division, the life tenant is not entitled to any increase in the value of the principal of the trust fund, or the capital and assets of the corporation, shares of which constitute the trust fund." See also: *Buist's Estate,* 297 Pa. 537, 542, 147 A. 606. Prior to the enactment of the Principal and Income Acts of 1945 and 1947, su-

---

[6] *In re Rees Estate,* 210 Ore. 429, 441, 311 P. 2d 438; *In re Tealdi's Trust,* 182 N.Y.S. 2d 68, 71; *In re Sanford's Estate,* 161 N.Y.S. 2d 507, 513.

pra, an occasion calling for an apportionment arose *only* when a division or distribution of corporate earnings took place either by corporate[7] or trustee[8] action. Subsequent to the passage of such legislation, to constitute an apportionable event not only must a division of corporate earnings be demonstrated but the occasion must fall within the classification of events recognized as apportionable events *prior* to the passage of such legislation: *Cunningham Estate,* 395 Pa. 1, 149 A. 2d 72; *Jones Estate,* 377 Pa. 473, 105 A. 2d 353. A "stock split" represents neither a division of corporate earnings or profits nor a recognized apportionable event and, therefore, is not apportionable.

Even if the 1954 stock distribution were considered a "stock dividend" or "in the nature of a stock dividend" it still falls short of qualification as an apportionable event. Assuming, arguendo, the factual validity of appellant's position that this stock distribution constituted a division of corporate earnings which, because of the Exchange rule, had been "over capitalized" in past years, the facts still remain that such capitalization was not contemporaneous with the issuance of the stock dividend and the stock distribution was supported only by a partial capitalization of earnings.[9] This type of stock distribution—a hybrid transaction—has never been accorded recognition as an apportionable event and to accord such recognition now, in the language of *Cunningham,* supra, ". . . would be to extend the Rule's [Pennsylvania Rule of Apportionment] application, an extension clearly without justification in the present state of the law".

---

[7] For example, a distribution of a cash or stock dividend, a liquidation of the corporation or an issuance of stock rights.

[8] For example, sale of stock by a trustee.

[9] Stipulations of Counsel, 29, 30. The book value of the new shares issued in 1954 was $82,164,551 to support which there was a (prior) capitalization of $44,673,626 of earnings.

Considered either as a "stock split" or a "stock dividend" the 1954 stock distribution of the Company did not constitute an occasion for apportionment.

In view of the conclusions we have reached it is unnecessary to consider appellees' argument that the Principal and Income Act of 1947, supra, controls the instant situation.

Decree affirmed[10] at appellant's costs.

---

[10] Appellant has urged that the equities favor the life tenant and that the basic aim of the Pennsylvania Rule has been to make available to life tenants—usually the primary objects of the settlor's bounty—the earnings accumulated on corporate stock held by a trust. From 1933 through 1954 the Company's total earnings with respect to the shares held by this trust were $1,720,326. The cash dividends ($507,049) and the market value of the stock dividends ($2,111,220) received by the appellant totalled $2,618,268 or $897,942 more than the Company earned on the trust shares. If appellant sold the stocks distributed to him immediately he would have realized this amount; if he retained them, including subsequent stock dividends thereon, he has received from this trust 93,156 shares of the Company's stock which would have been worth as of December 31, 1954, $6,520,920, absolutely tax free.