SWANN, Judge.
Judge Cardozo once observed that, “Few words are so plain that the context or the *645 occasion is without capacity to enlarge or narrow their extension.”[1]
In 1964, Keller Industries, Inc. (purchaser) entered into an eight page agreement to purchase all of the issued common stock of Silby-Dolcourt Chemical Industries, Inc. The agreement provided, inter alia:
******
“3. Payment for the said stock * * shall be made in the following manner:
“a. Upon execution hereof or as soon thereafter as is necessary for the stock to be issued by the transfer agent through normal channels, PURCHASER will deliver to SELLER 15,000 shares of PURCHASER’S capital stock.
“b. On February 14, 1966 PURCHASER will deliver to SELLER an additional number of shares of PURCHASER’S capital stock which will be valued at its closing price as quoted on the New York Stock Exchange at the close of business February 13, 1966. The total number of shares, including the 15,000 shares mentioned in paragraph ‘a’ above, will not exceed 30,000 shares (which number shall be proportionately adjusted for any stock split) and the total dollar purchase price will not exceed $600,000. The following examples are intended only to clarify this formula:
“(1) If Purchaser’s stock closes at $20.00 on February 13, 1966.
The total number of Purchaser’s shares to cover complete purchase would be 30,000; 15,000 delivered on February 14, 1964 and 15,000 delivered on February 14, 1966.
“(2) If Purchaser’s stock closes at $30.00 per share on February 13,1Ü56. The total number of Purchaser’s shares to cover the complete purchase price would be 20,000; 15,000 delivered on February 14, 1964 and 5,000 delivered on February 14, 1966.
“(3) If Purchaser’s stock closes at $18.00 per share on February 13, 1966. The total number of Purchaser’s shares to cover complete purchase would be 30,000; 15,000 delivered February 14, 1964 and 15,000 delivered on February 14, 1966.
“c. Nothing contained in this formula shall be construed so as to make or determine that the value of the first 15,000 shares of stock received by SELLER shall be diminished by reason of any stock splits or reverse stock splits; and provided further that in no event shall SELLER be held responsible for or held to account for and return to PURCHASER any of the original 15,000 shares of stock delivered to SELLER, regardless of the selling price of PURCHASER’S stock on the date for final accounting and payment, to wit February 14, 1966.
******
“5. The shares which are to be delivered on February 14, 1966 do not constitute deferred payments and there is no interest to be paid to the SELLER. Said shares shall not draw any dividends on behalf of SELLER.”
* *****
As is wont to occur in this era of inflationary growth, Keller declared a twenty percent stock dividend in the intervening period between the execution of the agreement in 1964 and the settlement date in 1966. Three thousand shares of Keller stock were thus distributed as a stock dividend to “Seller” in addition to the original 15,000 shares delivered in 1964 upon execution of the agreement. When the 1966 settlement date arrived, a dispute arose as to whether Keller was entitled to credit against the purchase price for the 3,000 shares of stock dividend or whether the dividend was to be considered an incident of stock ownership completely independent of the purchase payment computations, akin to a cash dividend which Keller conceded would have *646 had no bearing upon the computations for the final purchase payment.
Keller withheld the amount represented by the 3,000 shares and “Seller” instituted suit. The trial court held that the 3,000 share stock dividend was to he deemed an incident of ownership that was to have no bearing upon the computation of the final purchase price. Keller now appeals.
It is not disputed that “Seller” was the sole and absolute owner of the 15,000 shares delivered in 1964 and was free to alienate them in any manner. No restraints were imposed upon the Seller’s control and ownership over these 15,000 shares.
The question before us is whether .the term stock split as used in paragraph 3c of the agreement, encompasses stock dividends. We hold that it does not.
In a “stock dividend” there is capitalization of earnings or profit and distribution of shares which represent assets transferred to capital, whereas in a “stock split” there is a mere increase in the number of shares without altering the amount of capital or surplus. The distinguishing feature is the permanent retention of earnings in the business through formal transfer of earned surplus, legally available for dividends, to a capital account. In re Tealdi’s Trust, 16 Misc.2d 685, 182 N.Y.S.2d 68, 71 (1958); In re Thoms’ Trust, 3 Misc.2d 784, 152 N.Y.S.2d 939, 942 (1956). See also In re Fosdick’s Trust 4 N.Y.2d 646, 176 N.Y.S.2d 966, 152 N.E.2d 228 (1958).
It has also been said that:
******
“ * * * A substantial and conclusive difference exists between a ‘stock split’ and a ‘stock dividend’: in the former, a division of the shares of stock, not of the earnings or profits of the corporation, takes place without any change in or impingement upon the then existing status on the corporate books of the earned surplus and capital accounts; in the latter, an addition of shares of stock and a division of, at least, some of the earnings or profits of the corporation take place, such division being reflected on the corporate books by an irreversible allocation of corporate funds from the earned surplus to the capital account. * * * ” In re Trust Estate of Pew, 398 Pa. 523, 158 A.2d 552, 555 (1960).
******
Parenthetically, no argument is made that the Keller stock dividend was in fact anything but a stock dividend.
Keller has argued that such a construction leads to the result that “Seller” would be entitled to a total payment in excess of $600,000, when the contract provides that “the total dollar purchase price will not exceed $600,000.” It concedes, however, that had the dividend been paid in cash it would have been considered an incident of ownership for which Keller would not have been entitled to credit in the computation of the final purchase payment in 1966. Keller thus admits one instance in which it would have been possible for “Seller” to receive a total in excess of $600,000; the case before us presents another.
Paragraph 5 of the agreement provided specifically that the shares due to “Seller” on the settlement date should not draw any dividends. No such restrictions were placed on the 15,000 shares delivered under the agreement. It is obvious that under the terms of the agreement no restrictions or limitations as to dividends were imposed on the initial 15,000 shares.
Accordingly, the summary final judgment[2] is
Affirmed.

. Surace v. Danna, 248 N.Y. 18, 161 N.E. 315, 316 (1928).

. It is conceded by both parties that there were no unresolved issues of fact.