## Dunham Trust.

274

Argued November 12, 1968.  Before BELL, C. J.,
JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*Bennet N. Hollander,* with him *Lee A. Jackson* and
*Crombie J. D. Garrett, Mitchell Rogovin,* Assistant
Attorneys General, *Carlon M. O'Malley, Jr.,* Assistant
United States Attorney, and *Bernard J. Brown,* United
States Attorney, for United States, appellant.

*Sidney Z. Levy,* Special Assistant Attorney General,
*Francis J. Gafford,* Deputy Attorney General, and

276

*William C. Sennett,* Attorney General, for Commonwealth, appellant.

*Bernard G. Segal,* with him *Richard S. Seltzer, Thomas P. Glassmoyer, Samuel D. Slade, James K. Peck, James K. Peck, Jr.,* and *Schnader, Harrison, Segal & Lewis,* for trustee, appellee.

*Paul E. Pendel,* guardian and trustee ad litem, appellee, in propria persona.

OPINION BY MR. JUSTICE ROBERTS, January 24, 1969:

On December 24, 1941, James H. Dunham, Jr. received 1250 shares of the Eureka Specialty Printing Company from each of his parents. Six days later Dunham executed a Trust Agreement creating an inter vivos trust, the corpus of which was the 2500 shares of Eureka stock. The agreement provided, inter alia, that "The Grantor . . . irrevocably and absolutely assigned, transferred and set over unto Margaret G. Dunham, mother of the grantor, during her lifetime *any and all income paid or to be paid or arising from the aforesaid stock . . . .*" (Emphasis supplied). It also recited that ". . . this Agreement of Trust shall be absolutely and irrevocably binding upon all parties herein concerned and that it shall not be changed, modified, or altered in its terms, conditions or provisions unless the same shall be made in writing and *signed by all the parties concerned.*" (Emphasis supplied). At the same time the Trust Agreement was executed, James H. Dunham, Jr. also executed an assignment to his mother and father of "all my right, title and interest in and to all of *the dividends, including cash or stock dividends income* . . . from [the Eureka Specialty Printing Company stock] . . . . Said assignment is made subject to and governed by the terms, conditions, cove-

nants, stipulations and provisions as contained in that certain Trust Agreement . . . ." (Emphasis supplied).

Subsequent to the date of the Trust Agreement, the Eureka Specialty Printing Company made three separate distributions of additional shares of stock, all of which are at issue in the present litigation. The first took place in 1950, when the capital of the corporation was increased from $250,000 to $1,350,000 and the authorized shares were increased from 15,000 to 50,000. At this time the corporation distributed 15,000 of the newly-authorized shares to its stockholders and transferred $450,000 from earned surplus to the capital account. The result of this transaction was to double the number of shares held by the Dunham trust to 5000. The next distribution occurred on July 1, 1956 and included an increase in capital to $1,750,000 and a conversion of the existing stock into two new classes, Class A voting and Class B nonvoting. Transfer was made at the same time from the corporation's earned surplus account into its capital account in the amount of $750,000. This procedure resulted in the trustees holding in the trust corpus 5000 shares of Class A and 5000 shares of Class B stock.

Finally, on December 31, 1956 the last distribution was made, with one share of Class B stock being distributed for each fifty shares of Class A and each fifty shares of Class B held by individual stockholders. This transaction was accompanied by a transfer of $29,625 from earned surplus to the capital account of the corporation and resulted in the trust receiving an additional 200 shares of Class B stock. The net result of these three transactions was a trust corpus which contained 5000 shares of Class A and 5200 shares of Class B stock in the Eureka Specialty Printing Corporation, an amount of stock which was subsequently exchanged for 30,600 shares of Litton Industries, Inc. valued at the time of the accounting at $4,218,975.

From the inception of the trust all cash dividends on the corpus stock were paid to Margaret G. Dunham and all the stock issued with respect to these same shares was distributed to and held by the trustees. Thus when the First Pennsylvania Banking and Trust Company, substituted trustee, was called for audit before the Orphans' Court of Lackawanna County in 1965, the account showed a balance of $3,649,159.52 in principal and $18,000.99 in income. Both the United States and the Commonwealth were then authorized to intervene because of the tax consequence of any final decision of the orphans' court. In effect, both appellants claimed that these stock distributions should have been received by the life tenant and that Margaret G. Dunham's estate should have been much larger by virtue of the receipt of these stock dividends. The orphans' court determined that these stock distributions were correctly applied to the principal account, and it is from this adverse decision that the United States and the Commonwealth appeal.

## Settlor's Intent

Both sides agree that the retroactive provisions of the Uniform Principal and Income Act, Act of May 3, 1945, P. L. 416 and the Principal and Income Act, Act of July 3, 1947, P. L. 1283, 20 P.S. §3470.1 et seq., apply to this trust whether it was created in 1941 or created in 1954 by virtue of the amendment to the trust instrument made at that time.[1] *Norvell Estate,* 415 Pa. 427, 203 A. 2d 538 (1964); *Catherwood Trust,* 405 Pa. 61, 173 A. 2d 86 (1961). But appellants

---

[1] To obtain certain tax advantages, the trust agreement was significantly modified on July 28, 1954 by a "Supplemental Agreement" which was signed by the settlor, the three designated trustees and the remaining life tenant, Margaret Dunham.

claim that because settlor manifested his intent so clearly, §2 of the act requires us to follow settlor's own formula for distributing income and principal, instead of that of the act itself. Section 2 provides "This act shall govern the ascertainment of income and principal . . . . Provided, That the person establishing the principal may himself *direct the manner of ascertainment of income and principal* . . . ." (Emphasis supplied.)

Appellants' entire argument here is based on an assumption that we cannot accept. The Trust Agreement itself merely states that settlor's mother shall receive "any and all *income* paid or to be paid." This language falls far short of the type this Court should consider as indicative of a settlor's clear intent to distribute income and principal in a given way. In fact, it is exactly language like this, lacking expressed intent, which the Principal and Income Act sought to refine. Further, appellants do not seriously contend that this language *alone* creates a "manner of ascertainment of income and principal." Rather, they urge that the language in the contemporaneously executed assignment of the income, "all of the dividends, including cash or stock dividends income," demonstrates the settlor's intent to have the stock distributions go to the income beneficiary. However, it is our view that the assignment language should not be considered relevant to ascertaining the intent recited in the trust instrument.

First, the Trust Agreement itself stated that the terms of the trust should not be "changed, modified, or altered in its terms, conditions or provisions unless the same shall be made in writing and *signed by all the parties concerned.*" The assignment urged for our consideration in this case was signed only by the settlor. Second, the actual assignment of the income to Mar-

garet Dunham took place upon the execution of the Trust Agreement. The trial court's opinion indicates that it found the purpose of the assignment was merely to inform the Eureka Specialty Printing Company of the entire transaction. From a document with such an informal purpose, it would seem inappropriate to attach any particular significance to the precise language there employed as decisive of the meaning of the trust instrument. Third, the terms of the assignment itself were made *"subject to and governed by* the terms, conditions, covenants, stipulations and provisions" of the Trust Agreement of the same date.

Finally, even assuming *arguendo* that some substantive effect should be given to the language of the assignment, see *Blish Trust,* 350 Pa. 311, 38 A. 2d 9 (1944), it is clear that the phrase which appellants claim clearly expresses the settlor's intent does not approach the clarity required by §2 of the Principal and Income Act. In *McEldowney Estate,* 415 Pa. 87, 202 A. 2d 100 (1964), this Court held that in order to give effect to §2, the settlor must have "clearly expressed an intention" to allocate between principal and income. See *Heppe Estate,* 37 Pa. D. & C. 2d 504, 509 (Phila. Cty. 1965). The words "all of the dividends, including cash or stock dividends income" hardly establishes the required clear intent. This awkward language can be interpreted to mean that dividends included cash income which might be derived in the future from stock distributions subsequently received; or it can be interpreted to mean the subsequent stock distributions themselves. See *Fleck Estate,* 406 Pa. 363, 178 A. 2d 574 (1962). Therefore, even if the language of the assignment is considered, no clear intent is expressed; we must turn to the provisions of the Principal and Income Act to determine the correct allocation of these three stock distributions.

## The 1950 Stock Distribution

This stock distribution gave to each holder of Eureka common stock one additional share for each share already owned by the stockholder. The stock transaction was characterized by the corporation as a "stock dividend" and at the same time there was a transfer made on the corporate books from surplus to capital. However, whether the distribution is considered a change in the capital structure of the corporation or a dividend, the Principal and Income Act clearly establishes that the new stock received shall be treated as principal. Section 5(4) of the act, 20 P.S. §3470.5 (4), directs that "where the capital structure of a corporation is changed, either with or without merger or consolidation, and the securities of the . . . reorganized . . . corporation . . . are issued to the shareholders of the original corporation in like proportion to or in substitution for their shares in the original corporation . . . the securities . . . shall be deemed principal. . . ." And §5(1) of the same act, as amended by the Act of August 1, 1963, P. L. 442, 20 P.S. §3470.5(1), provides that "Corporate distributions made to a trustee in the shares of the distributing corporation, however described or designated by the distributing corporation, shall be deemed principal [except for stock dividends of six per cent or less, an exception not here relevant] . . . ."[2]

Whether this trust is considered to have been created in 1941 or 1954, at the time of the aforementioned amendment, the provisions of the act still apply. This

---

[2] Before the amendment this section read "All dividends on shares of a corporation, forming a part of the principal, which are payable in the shares of the corporation itself of the same kind and rank as the shares on which such dividend is paid shall be deemed principal." Thus, regardless of which section is applied the result reached for the 1950 stock distribution is the same.

Court, in *Catherwood Trust,* 405 Pa. 61, 173 A. 2d 86 (1961) held that in all audits pending as of the date of the *Catherwood* decision (July 26, 1961) distributions should be made according to the terms of the Principal and Income Act of 1947. See *Pew Trust,* 411 Pa. 96, 104, 191 A. 2d 399, 404 (1963). Since this distribution of stock on a one for one basis does not come within the narrow exception to the act carved out by the *Pew Trust* decision (that stock dividends of six per cent or less in trusts created before 1945 should be considered income), it is clear that either §5(1) or 5(4) requires this distribution to be considered principal.

## The July 1956 Stock Distribution

This transaction involved the recall of all the outstanding stock of the Eureka Company. In return for each share exchanged, every stockholder received one share of Class A voting stock and one of Class B nonvoting stock, the A and B shares being equal in all respects but the voting privilege. This exchange was accompanied by an increase in the capital of the corporation and a transfer into the capital account from the earned surplus account. We agree with the court below that this distribution comes within the provisions of §5(4) of the Principal and Income Act, supra, which apply when the "capital structure of a corporation is changed." Therefore, we affirm the trial court's determination that this new stock was correctly attributed to principal. What we have said above with regard to the 1950 distribution applies with equal force here.

## The December 1956 Stock Distribution

This final distribution included the receipt by each stockholder of one share of Class B stock for each fifty

shares of Class A held and one share of Class B for each fifty shares of Class B owned. In other words, there was a two per cent stock dividend accompanied by a transfer of funds from the earned surplus to the capital account. In order to properly allocate this distribution between income and principal, an initial determination of whether this trust should be viewed as having been created in 1941 or 1954 must be made. For if the trust was created in 1941, our decision in *Pew Trust* applies "that as to . . . inter vivos trusts created prior to the effective date of the Principal and Income Act of 1945 a gift of income or net income included small stock dividends of 6% or less, . . . ." 411 Pa. at 109, 191 A. 2d at 406. This would result in the stock distribution being apportioned to income.

On the other hand, if this trust is viewed as a 1954 trust, we should apply the Principal and Income Act of 1947 which attributed all stock dividends regardless of size to principal.[3] Act of July 3, 1947, P. L. 1283, §5(1). The trial court concluded that because of the amendments to the trust instrument made in 1954, the "trust in question must be viewed as a post 1945 trust for this purpose." We think this conclusion is amply supported in the record and agree with this conclusion. At the time of the trust amendment the three trustees and the life beneficiary participated; they all had an opportunity to consider the changes in Pennsylvania law since 1941. The settlor had a chance to express an intent contrary to the result dictated by the Principal and Income Act of 1947. Instead, he allowed the provisions of the trust to remain the same as they

---

[3] It might be argued that the 1963 amendment which codified this Court's *Pew Trust* decision should apply. However, that act explicitly provides that its provisions shall only apply to stock dividends accruing after the effective date of the September 30, 1963 act. See Act of August 1, 1963, P. L. 442, §3.

were. Thus the 1947 Act should apply, resulting in the two per cent stock dividend being included in principal.

Therefore the decree of the court below is affirmed in its entirety. Each party to pay own costs.

Mr. Chief Justice BELL and Mr. Justice COHEN dissent.