432 A.2d 158

ESTATE OF William N. REYNOLDS, Jr., Deceased.

Appeal of Ruth Reynolds MURRAY and Ella Reynolds Ring Storrs (Appellants at No. 37 January Term, 1979).

Appeal of Barbara R. HAINES, Jane R. Meade and Nicholas W. Reynolds (Appellants at No. 45 January Term, 1979).

Supreme Court of Pennsylvania.

Argued Jan. 22, 1981.

Decided July 2, 1981.

James R. Ledwith, Francis M. Richards, Jr., Edward J. Lentz, Philadelphia, for Murray et al.

Linda A. Fisher, Robert L. Freedman, Philadelphia, for Haines et al.

James E. Davis, Tunkhannock, for United Penn Bank of Wilkes-Barre.

Before O'BRIEN, C. J., and ROBERTS, NIX, LARSEN, FLAHERTY and KAUFFMAN, JJ.

OPINION OF THE COURT

ROBERTS, Justice.

This appeal from a final decree of the Court of Common Pleas of Luzerne County, Orphans' Court Division, presents the question whether 15,667 shares of stock received by the trustee of a testamentary trust as part of a 3-for-2 stock distribution should be treated as income, as contended by appellants, or allocated to principal. The orphans' court held the distribution to be controlled by the Principal and Income Act, 20 Pa.C.S. § 8105(a), which provides:

"Corporate distributions made to a trustee in the shares of the distributing corporation, however described or designated by the distributing corporation, shall be deemed principal but if the number of shares . . . is 6% or less of the number of shares . . . outstanding . . . the shares so distributed shall be deemed income."

The court accordingly decreed that the shares be allocated to trust principal. For the reasons set forth below, we agree and affirm.

I.

The parties to this appeal, settlor's two surviving children (appellants at No. 37) and the three children of settlor's deceased son (appellants at No. 45; hereafter "appellees"), have stipulated to all relevant facts. Settlor William N. Reynolds, Jr., died on January 2, 1957, leaving a will and a trust agreement dated August 11, 1955. Settlor, who never married, was survived by three adopted children (his nieces and nephew), seven grandchildren, and nine great-grandchildren. Paragraph EIGHTH of settlor's will directs that the

residue of his estate be placed in trust with Miners National Bank of Wilkes-Barre (now United Penn Bank), in accordance with the trust agreement, which is incorporated into the will.

Paragraph FIRST of the trust agreement provides that the trustee shall pay trust income in equal shares to settlor's three children during their lives. Upon the death of each of these children, the principal supporting his or her one-third share of income is to be divided per capita among all living grandchildren of settlor and distributed to those who have reached age thirty-five. The share of any grandchild who has not reached the age of thirty-five at the time of such division is to be held in a separate trust until he or she becomes thirty-five. If any grandchild dies before the trust terminates, his or her issue is to receive, per stirpes, the grandchild's share of trust income and principal. The share of a grandchild who dies without issue is to be divided among the surviving grandchildren. The trust agreement does not authorize the trustee to invade principal.

Paragraph THIRD of the trust agreement provides:

"In distinguishing between principal and income hereunder, the Trustee need not amortize premiums paid for or charged in respect of investments and shall take no account of discounts. The Trustee may so apportion between principal and income, any expenditures, which in its opinion should be apportioned, notwithstanding any legal rules to the contrary. *Any and all dividends shall be considered as income.* (Emphasis supplied.)

There is no comparable provision in the will.

At the time of his death in 1957, settlor, an attorney, owned 12,400 shares of the common stock of United States Fidelity and Guarantee Company ("U.S.F. & G.") and had served on its Board of Directors since 1934. The stock of U.S.F. & G., a Maryland corporation, was traded over the counter from 1952 to 1970. Since July 27, 1970, it has been traded on the New York Stock Exchange.

During the administration of settlor's estate and prior to the funding of the trust, U.S.F. & G. announced a 2-for-1

stock split and a 10% stock dividend, resulting in an increase in the shares held by the estate to 27,280. These shares were distributed to the trustee on June 14, 1960. In 1962, 1965, and 1966, U.S.F. & G. issued stock "dividends" of 10%, 5%, and 10%, respectively, and in 1970 it paid a 2-for-1 stock split, reducing the par value of its shares from $5.00 to $2.50. The trustee allocated the shares received in the first three distributions to income and added the shares received through the 1970 split to principal.

Settlor's son, Stewart Reynolds, died on June 19, 1975. After the filing and confirmation of a first and partial account, to which no objections were taken, the trustee distributed one third of the trust principal, including 15,666 of the 47,000 U.S.F. & G. shares then held by the trust, to settlor's six surviving grandchildren.[1]

On May 3, 1977, the trustee received an additional 15,667 shares of U.S.F. & G. stock, together with a letter from the President and Chairman of the Board of the company, advising the trustee that, as a stockholder, the trust was entitled to participate "in the 3-for-2 stock split up declared by the Board of Directors on February 23, 1977, at the rate of one share of common stock for each two shares held of record at the close of business on April 1, 1977." The letter further advised that the regular quarterly cash dividend would be mailed separately.

The trustee treated the "split up" as a dividend and allocated all of the resulting 15,667 shares to trust income, in accordance with its interpretation of the direction in paragraph THIRD of the trust agreement that "any and all dividends shall be considered as income." At the same time it filed a second and partial account of trust assets and a petition for adjudication with the orphans' court, seeking a judicial determination of the proper allocation of the shares.

In addition to the history set forth above, the parties also stipulated that:

1. Settlor's seventh grandchild died without issue in 1965.

1. The 1977 stock distribution was made pursuant to a resolution by the Board of Directors of U.S.F. & G., which stated:

   "RESOLVED, that for the purposes of effectuating a 3-for-2 stock split-up of the issued shares of common stock, $2.50 par value, of this Company, a 50% stock dividend and distribution (namely, the distribution of one share of such common stock for each two shares held) be and the same is hereby declared, in shares of the common stock of this Company ,at the close of business on April 1, 1977.

2. The distribution was accompanied by a transfer of $20,545,420, representing the par value of the newly issued shares, from the earned surplus account to the capital account on the U.S.F. & G. books.

3. The U.S.F. & G. 1976 annual report to stockholders described the May, 1977, distribution as "a 3-for-2 stock split-up."

4. The application filed by U.S.F. & G. with the New York Stock Exchange for Exchange approval of the listing of the shares distributed in May, 1977, described the distribution as "a 3-for-2 split-up of the Common Stock, $2.50 par value, of the Company."

5. The Standard and Poor's 1977 Annual Dividend record reported the 1977 U.S.F. & G. distribution as "a 3-for-2 split."

6. The Commerce Clearing House *Capital Changes Reporter*, June 17, 1977 at 1613, reported the 1977 U.S.F. & G. stock distribution as "a common split 3–2."

7. As of November 30, 1976 (prior to the May, 1977, 15,667-share stock distribution), the fair market value of the trust principal, including 31,334 shares of U.S.F. & G., was $2,197,570. The 31,334 shares of U.S.F. & G. were valued at approximately $1,570,616, and the closing price for U.S.F. & G. on the New York Stock Exchange on that date was 50⅛.

8. As of November 30, 1977, the fair market value of the trust principal, including 31,334 shares of U.S.F. & G. but not including the shares distributed in May, 1977, was $1,710,585. The fair market value of the 31,334-share U.S.F. & G. holding was $1,049,689. The 15,667 shares distributed the previous May had a market value of $524,844. The closing price for U.S.F. & G. on the New York Stock Exchange on that date was 33½.[2]

## II.

In the orphans' court, appellees contended that both settlor's intent and the terms of section 8105(a) of the Principal and Income Act require that the shares be allocated to principal. Appellants, the two surviving income beneficiaries, argued that by the terms of paragraph THIRD of the trust agreement, settlor had displayed a clear intent to override the application of the Act and that, as a stock dividend, the shares should be distributed as income.

The auditing judge, although observing that "[t]here seems little doubt that the law in Pennsylvania considers the U.S.F. & G. distribution ... a stock dividend," held that settlor had not expressed a "contrary clear intent" that the Principal and Income Act not apply to the trust and that the stock distribution should thus be allocated to principal. The auditing judge also held inadmissible three letters written by settlor to his children in 1952 and offered by appellees as probative of settlor's intent that a large stock distribution benefit the remaindermen rather than the income beneficiaries. Appellees excepted to the exclusion of these letters. Appellants excepted on several grounds to the court's allocation of the stock to principal, contending, inter alia, that such an allocation was inconsistent with the fact that the "Auditing Judge held that the 50% stock distribution in issue is unquestionably a stock dividend."

2. Thus, stipulations # 7 and # 8 indicate that treatment of the distribution as principal would restore the trust to its pre-distribution value, whereas treatment of the distribution as income would result in a 25% decrease in the value of trust assets.

Appellees initially regarded the above "holding" as to the nature of the distribution as mere discussion to which no exception would properly lie, see Pa.R.Civ.P. (Equity) 1518; Supreme Court Orphans' Court Rule 3.1; 64 Luz.Leg.Reg. 155 (1974). However, once appellants challenged their failure to except, appellees immediately petitioned for leave to file an exception *nunc pro tunc*, which was granted over appellants' objection. The court then considered and dismissed all exceptions of both parties and decreed that the 15,667 shares of U.S.F. & G. stock be allocated to principal. In so doing, the court reiterated its conclusion, "without qualification, that the stock distribution was a stock dividend under Pennsylvania law" and again stated that this conclusion was irrelevant to the determination of whether settlor had expressed a clear and unambiguous intent to override the application of the Principal and Income Act to the distribution at issue.

From this decree both parties appealed. Appellees continue to dispute the auditing judge's characterization of the distribution as a "dividend." [3] Appellants persist in their contention that settlor's direction in Paragraph THIRD that "any and all dividends shall be considered as income" requires the allocation of the distribution to income.

### III.

It is clear that a settlor may "himself direct the manner of ascertainment of income and principal . . . and such provisions . . . shall control." 20 Pa.C.S. § 8102. To supersede the operation of the Principal and Income Act, such a direction must be clearly expressed. *Dunham Trust,* 433 Pa. 273, 249 A.2d 531 (1969). Accord, *McEldowney Estate,* 415 Pa. 87, 202 A.2d 100 (1964). It is undisputed

---

**3.** Appellants urge us to hold that appellees have waived their objection to the description of the distribution as a dividend through their failure to file a timely exception and that the auditing judge abused his discretion in permitting them to file an exception *nunc pro tunc.* Because we agree with the auditing judge that the precise characterization of the distribution under Pennsylvania law is irrelevant to the ultimate determination of this appeal, we do not address this contention.

that, absent a direction of sufficient clarity, section 8105(a) of the Act mandates the allocation of the distribution at issue to principal.

In essence, appellants' argument is that (1) the words "any and all dividends shall be considered as income" are such a clear and unambiguous direction;  and (2) since the U.S.F. & G. stock distribution is "unquestionably a stock dividend" under Pennsylvania law, it should be allocated to income. An examination of the latter contention sheds considerable light on the former, and crucial, issue.

### A.

The authority for the auditing judge's characterization of the distribution as a dividend is this Court's decision in *Pew Trust*, 398 Pa. 523, 158 A.2d 552 (1960).  At issue there was whether, under the "Pennsylvania Rule of Apportionment," a stock distribution involving no transfer of funds from the corporation's earned surplus account to its stated capital was "an apportionable event." [4]  In holding that the distribution was a non-apportionable event, allocable entirely to principal, this Court observed in dicta:

> "A substantial and conclusive difference exists between a 'stock split' and a 'stock dividend':  in the former, a division of the shares of stock, not of the earnings or profits of the corporation, takes place without any change in or impingement upon the then existing status on the corporate books of the earned surplus and capital accounts;  in the latter, an addition of shares of stock and a division of, at least, some of the earnings or profits of the corporation take place, such division being reflected on the corporate books by an irreversible allocation of corpo-

4. Although the Principal and Income Act was adopted in 1947, this Court initially held unconstitutional its application to receipts of trusts created prior to the effective date of the Act. *Crawford Estate*, 362 Pa. 458, 67 A.2d 124 (1949); *Pew Estate*, 362 Pa. 468, 67 A.2d 129 (1949); *Warden Trust*, 382 Pa. 311, 115 A.2d 159 (1955). Thus, until this Court reversed its position and held constitutional the application of the Act to *all* trust receipts after the effective date, *Catherwood Trust*, 405 Pa. 61, 173 A.2d 86 (1961), the Rule of Apportionment remained applicable to all receipts of pre-1947 trusts.

rate funds from the earned surplus to the capital account."

Id., 398 Pa. at 529, 158 A.2d at 555 (footnote omitted).

    Even though the discussion of stock dividends in *Pew* was clearly dicta and the rule of apportionment to which it applied has been abrogated and replaced by the Principal and Income Act, 20 Pa.C.S. § 8105, appellants maintain that the *Pew* test is nevertheless applicable to stock distributions controlled by the Act. In support they cite *Wasserman Estate*, 57 D. & C. 127 (O.C.Phila.1972), where the orphans' court held that a detailed direction to treat as income dividends, "either regular or extraordinary," from any source, and "irrespective of the form in which the same may be declared and paid," was sufficiently clear to override the application of the Principal and Income Act and require the allocation to income of all stock distributions supported by a transfer of any amount from earned surplus to capital. In so holding, the orphans' court stated:

> "As the court found in *Pew*, the achievement of certainty dictates that whenever *any* earned surplus is transferred, the transaction is a stock dividend. Only when there is absolutely no change in the financial structure of the corporation is the distribution of new shares to be regarded as a stock split."

Id. at 135 (emphasis in original).

The achievement of certainty is undoubtedly a commendable goal, but in a case governed by the Principal and Income Act, the search for certainty through a test applicable to the old, legislatively abrogated rule of apportionment is a misguided and futile effort. Indeed, it was the very uncertainty created by the antiquated rule that led the Legislature to replace the rule with the Principal and Income Act of 1947.

Our cases have chronicled in detail the history and demise of the rule of apportionment. First applied by judicial decision in *Earp's Appeal*, 28 Pa. 368 (1857), the Rule "was an equitable one which at the time of its conception and for many years thereafter—under vastly different economic conditions than those of the last several decades—strove to

balance the equities between life tenants and remaindermen with the aim of protecting the interests of both." *Catherwood Trust*, 405 Pa. 61, 65–66, 173 A.2d 86, 88 (1961). However,

"[i]n recent years, the ingenuity of corporate management, seeking to achieve various ends such as broadening or enhancing the market for its stock, effect tax savings, etc., has produced a complexity of corporate transactions which involve the transfer on corporate books of earnings, earned surplus, etc., from one account to another. Earnings, under modern corporate practice, no longer retain the simplicity of meaning of the earnings considered by this Court in *Earp's Appeal*, supra, and other decisions."

*Cunningham Estate*, 395 Pa. 1, 11, 149 A.2d 72, 78 (1959).

"In the face of the generally known and experienced difficulty, complexity and uncertainty under the prior rule of apportionment in ascertaining the 'intact value' of designated shares of stock at a given time, the Legislature acted to provide for a fairer, more orderly and more uniform apportionment between income and principal. The particular definitions which the Legislature adopted by the 1947 Act represent what that body determined to be a pragmatic necessity for a current, definite, more understandable and more workable rule of fair apportionment."

*Norvell Estate*, 415 Pa. 427, 435, 203 A.2d 538, 542 (1964) (footnote omitted). Accord, *Anthony Estate*, 423 Pa. 401, 223 A.2d 857 (1966). Designed "to provide convenient and workable rules of administration of estates in conformity with what would be the wishes of most settlors," III Scott on Trusts, § 241A at 2102 (3d ed. 1967), the Principal and Income Act looks not to changes in the corporate balance sheet, as did the former rule of apportionment, but to the form of the distribution. Thus, section 8105(a), as amended by Act of August 1, 1963, provides simply that distributions by a corporation in its own shares, "however described or designated by the distributing corporation," shall be deemed principal if the number of shares is greater than 6% of the number of shares outstanding, and income if 6% or less. In

adopting the Act and abrogating the old rule, the Legislature has effectively declared irrelevant the "capitalization of earnings" test of stock distributions enunciated in *Pew Trust,* supra, and followed in *Wasserman Estate,* supra.

### B.

The sole question under the Principal and Income Act, therefore, is whether the settlor has expressed, pursuant to section 8102, a clear intent to override the application of the Act to stock distributions.

■ Of course, the words "any and all dividends shall be considered as income" must not be read in a vacuum. It is hornbook law that a will is to be construed according to the intent of the testator. "To ascertain this intent, a court examines the words of the instrument and, if necessary, the scheme of distribution, the circumstances surrounding the execution of the will and other facts bearing on the question." *Sykes Estate,* 477 Pa. 254, 257, 383 A.2d 920, 921 (1978). Accord, e. g., *Houston Estate,* 491 Pa. 339, 421 A.2d 166 (1980); *Hamilton Estate,* 454 Pa. 495, 312 A.2d 373 (1973). This well-settled principle applies equally to trusts. *Pew Trust,* 411 Pa. 96, 191 A.2d 399 (1963); *Walton Estate,* 409 Pa. 225, 186 A.2d 32 (1962). Here, however, nothing in the will, the trust agreement, or the surrounding circumstances provides any support for appellants' position that settlor would have intended the 15,667 shares involved in this stock distribution to go to the income beneficiaries.

■ Appellants argue that a clear intent is expressed because settlor would have regarded the 3-for-2 stock distribution as a "dividend" and wished it allocated to income. In support, appellants rely on the facts that settlor was a director of U.S.F. & G. during a period when it characterized several relatively small stock distributions as "dividends" and that the U.S.F. & G. Board of Directors characterized the present distribution, in an internal memorandum, as "a 50% stock dividend and distribution" "for the purposes of effectuating a 3-for-2 stock split-up."

That the corporation privately described the distribution as both a "dividend" and a "split-up" is certainly not disposi-

tive of the issue. As Justice Holmes observed in a related context, "[a] word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances at the time in which it is used." *Towne v. Eisner*, 245 U.S. 418, 425, 38 S.Ct. 158, 159, 62 L.Ed. 372 (1918). Significantly, in all its public descriptions of the distribution, including its announcement of the distribution to shareholders and its annual report, U.S.F. & G. referred to the distribution only as a "split-up." Under the rules of the New York Stock Exchange and generally accepted accounting principles, U.S.F. & G. could not have described its 3-for-2 distribution as a dividend without transferring to stated capital the fair market value of the newly issued shares, not simply the par value, as was transferred here. See *New York Stock Exchange Company Manual*, § A–263; American Institute of Certified Public Accountants, Accounting Research Bulletin No. 43, Ch. 7, Section B, ¶ 11 (1953). See also Fletcher, *Cyclopedia Corporations*, § 5362.1 at 750 (1971 ed.; 1979 cum. supp.) ("capitalization of earnings incident to an increase in the number of outstanding shares is far from conclusive as to whether the transaction is properly designated as a dividend or a split"). Manifestly, to attempt a precise categorization of a stock distribution as a "dividend" or a "split" and a divination of settlor's intent on the basis of conflicting corporate descriptions is to ignore the mandate of the Legislature in adopting the Principal and Income Act and to return to the confusion of the old rule of apportionment.

Nor does the modification of the word "dividends" by the adjectives "any and all" resolve the ambiguity, as contended by appellants. New York, which has adopted a principal and income act similar to Pennsylvania's, has observed:

"The term 'stock dividend' is inherently ambiguous in that there are technical distinctions between 'stock dividends' and 'stock splits' (see *Matter of Payne*, 7 N.Y.2d 1, 194 N.Y.S.2d 465, 163 N.E.2d 301; *Matter of Fosdick*, 4 N.Y.2d 646, 176 N.Y.S.2d 966, 152 N.E.2d 228). Thus, the Practice

Commentary to EPTL 11–2.1 explicitly states that a direction in the governing instrument to allocate a 'stock dividend' in a certain way would *not* constitute a sufficiently clear expression of the creator's intention to preclude the application of the 6% rule (Hoffman, Practice Commentaries, McKinney's Cons.Laws of N.Y., Book 17B, p. 130)."

*Matter of Estate of Ward*, 58 A.D.2d 606, 607, 395 N.Y.S.2d 671, 672 (1977) (emphasis in original). As long as the meaning of "dividends" remains uncertain, the words "any and all" can of course add nothing.

Appellants urge that settlor's grant of discretion to the trustee to allocate expenses between income and principal "notwithstanding any legal rules to the contrary," which appears in the sentence preceding settlor's direction as to "dividends," demonstrates settlor's intent to preclude the operation of the Principal and Income Act as to stock "dividends" as well. Clearly, however, the phrase "notwithstanding any legal rules to the contrary" applies only to the allocation of trust expenses. To view it as modifying the succeeding sentence referring to "dividends" would distort syntax and defy logic. See *Houston Estate*, supra, 491 Pa. at 349, 421 A.2d at 172.

The identity of the respective beneficiaries likewise fails to support appellants' position. If settlor had bequeathed the principal of his trust to a charity or to unascertained descendants, one might assume that he would prefer to benefit his children, the income beneficiaries, over such distant legatees. See Scott, supra at § 236.3, 1985. Here, however, the remaindermen are settlor's grandchildren, all of whom were living at the time he executed his will and trust agreement. Indeed, the trust provides for the gradual distribution of principal to these grandchildren, directing that they are to receive immediately the share of any deceased income beneficiary. Moreover, the trustee is granted no power to invade the corpus on behalf of the income beneficiaries.

An examination of the alternative allocations of the stock distribution in light of the identity of the beneficiaries and

the above trust provisions further undercuts appellants' position that settlor would wish the distribution allocated to income. If the 15,667 shares distributed in U.S.F. & G.'s 3-for-2 stock "split-up" are allocated to principal, the value of the trust corpus will remain virtually unchanged, and settlor's surviving children will be entitled to receive the dividend income from all 47,001 shares of U.S.F. & G. stock held by the trust. On the other hand, if the distribution is allocated to income, the value of the U.S.F. & G. stock remaining in the trust will be reduced by nearly one third, and the value of total trust assets by 25%.

Nothing prevents a settlor from achieving such a seemingly inequitable result, if he wishes to do so. He must, however, direct it by clear and unambiguous language. *Dunham Trust*, supra; *McEldowney Estate*, supra. In the will and trust agreement of settlor William Reynolds, Jr., no such clear direction exists. The words "any and all dividends shall be considered as income" do not begin to approach the level of clarity necessary to preclude the operation of section 8105(a) of the Principal and Income Act.

Accordingly, the decree of the orphans' court, allocating the 15,667 shares received in the 3-for-2 stock distribution to principal, is affirmed.

Each party pay own costs.