Reznor Estate.

Argued March 19, 1965. Before BELL, C. J., MUS-MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*Nathan Routman,* with him *Routman, Moore & Goldstone,* for appellant.

*Lee C. McCandless,* with him *Thomas A. Sampson, Jr.,* for appellees.

*James A. Stranahan, III,* for appellee.

OPINION BY MR. JUSTICE EAGEN, October 13, 1965:

This is an appeal from the decree of the Orphans' Court of Mercer County, dismissing exceptions to the final account of David R. Webster (trustee), Trustee of the Estate of Claud L. Reznor (testator), filed by Dorothy Reznor Pryts (Pryts), Executrix of the Estate of Luella L. Reznor, and directing distribution according to the proposed schedule.

Claud L. Reznor died testate on August 6, 1918, and by his will bequeathed 16 shares of stock in the Reznor Manufacturing Company (Company), then a closely-held family corporation, in trust, providing that "the dividends from the same shall by the said Trustee be paid to Luella Reznor and at her death shall be by said Trustee divided equally between my three chil-

dren, George Reznor, Fred Reznor, and Dorothy Reznor or their heirs."

The named trustee died on August 7, 1918, and testator's brother qualified and served as trustee until his death on July 2, 1956. Thereafter, the present trustee was appointed and it is his account, the first ever filed in this estate, which is the subject of this appeal.

Luella L. Reznor died testate on March 22, 1964, and Pryts was appointed her Executrix. Pryts and the heirs of Fred Reznor, deceased, are the sole (for these purposes) legatees of the estate of Luella, who ignored in her will the heirs of George Reznor, also deceased. Pryts is also one of the children-remaindermen named in testator's will, being the sole survivor thereof.

After testator's death, several things happened to the capital structure of the Company. In 1922, the stock split 8 for 1, giving the trustee 144 shares. In 1928, a 60% stock dividend of newly issued 7% cumulative preferred shares was declared and issued, giving the trustee 144 shares of common and 86 shares of new preferred. In 1938, pursuant to reorganization, the 144 shares of common were called and in return therefor the trustee received 16 shares of new common (no par), and in return for the 86 shares of 7% preferred, he received 86 shares of the new common, giving him a total of 102 shares of new common. In 1950, another split of 9 for 1 gave the trustee an additional 918 shares or a total of 1020 shares of the new common. Thereafter, in 1961, the Company merged with Bell & Gossett Company, and the trustee received 18,615 shares of Bell & Gossett on an 18½ for 1 basis. Then in 1963, Bell & Gossett Company merged with International Telephone and Telegraph (ITT), and in return for his 18,615 shares of Bell & Gossett, trustee received 6,236 shares of ITT common and 1303 shares of ITT preferred (plus a small amount of cash to cover fractional shares not issued). It is these shares of ITT

(both common and preferred) which are the subject of this disputed distribution.

The distribution of this trust corpus proposed by the trustee, and finally confirmed by the court below, is to divide the ITT stock (as well as cash dividends received thereupon after Luella's death) into three equal parts, and to give one equal part each to Pryts, the "Estate" of George Reznor, and the "Estate" of Fred Reznor.[1] Pryts, as appellant, contends that certain of the events occurring during the aforementioned changes in capital structure of the Company should have resulted in apportionment between corpus and income, and that the trustee, at those times, should have turned over certain of the shares to Luella as income. The result of sustaining this contention would be that Pryts and the heirs of Fred Reznor, being the sole legatees of the Estate of Luella L. Reznor (to the exclusion of the heirs of George Reznor), would receive substantially larger portions of the stock to be distributed than the proposed equal 1/3 parts.

Two important questions are raised by this appeal: (1) Were any of the capital-structure changes apportionable events? and, (2) if so, does the Principal and Income Act of 1947, Act of July 3, 1947, P. L. 1283, §1 et seq., 20 P.S. §3470.1 et seq., apply retroactively so as to require all the stock to be included in the corpus?

The oft-stated and time-honored declaration is that the Pennsylvania Rule of Apportionment[2] recognizes "an 'apportionable event' to occur in four situations: (1) the distribution by a corporation of an extraordinary cash or stock dividend; (2) the liquidation of the

---

[1] No exception is raised as to the distributee being the "Estate" rather than "heirs" in this case. It is apparent that the same parties would take in either event, however.

[2] See, e.g., *Nirdlinger's Estate*, 290 Pa. 457, 139 A. 200 (1927), and *Earp's Appeal*, 28 Pa. 368 (1857).

corporation; (3) the sale of the stock by the trustee; (4) the issuance of stock rights: Cunningham Estate, 395 Pa. 1, 7, 149 A. 2d 72; Jones Estate, 377 Pa. 473, 476, 105 A. 2d 353; Buist's Estate, 297 Pa. 537, 147 A. 606." *Catherwood Trust,* 405 Pa. 61, 67, 173 A. 2d 86, 88 (1961).

In 1928, as above stated, the Company was authorized to create and issue a new class of stock, 7% cumulative dividend preferred shares, with provisional voting rights and priority in the distribution of assets upon the liquidation of the Company. Of this stock, 498 shares were sold to the public by the Company, and 2,130 shares were distributed to the then holders of the common stock of the Company on the basis of 6 shares of the new 7% preferred stock for each 10 shares of common held (or a 60% dividend). Into the record was read the following portion from the minutes of the Board of Directors of the Company for April 26, 1928: "The Board of Directors may declare a stock dividend of 2,130 shares out of the surplus of the corporation to the holders of the common stock." Of course, the characterization as a "dividend" by the Directors is not controlling, but is one of the factors in determining whether or not an apportionable event has occurred. That it would not be unreasonable to find that it was, in fact, a dividend is bolstered by the testimony to the effect that in another year, 1922, cash dividends of 30%, 25%, and 5% (or a total of 60%) were declared and paid, and that cash dividends were paid regularly throughout the predepression years. It was also testified that the purpose of this dividend was to allow the holders of the common stock to diversify or liquidate more readily their holdings (the shares of this closely-held corporation being the major asset of most of the family members at that time) without relinquishing their proprietary interest in the Company. The dividend was to be paid from "surplus", which was

represented to be, at the beginning of 1928, in the sum of $492,721. From the above, we think it is clear that this distribution was in fact an "extraordinary stock dividend" which represented an apportionable event under the Pennsylvania Rule of Apportionment. It is therefore necessary for the court below to reconsider this case to determine the apportionment which should have taken place in 1928 according to the rules then extant, and to declare what portion, if any, of the 7% preferred stock was required to be retained to maintain the intact value, and what portion was attributable to income.

If the court below determines that some portion of the 7% preferred stock should have been retained to maintain the intact value, another problem arises from the transaction of 1938 when all of the stock was exchanged for new common, as above discussed. While the transaction of 1938 does not fit into the demarcated categories laid out in *Catherwood Trust*, supra, *Fisher's Estate*, 344 Pa. 607, 612, 26 A. 2d 192, 195 (1942), aptly states that ". . . the summary [in *Buist's Estate*, supra, cited in *Catherwood Trust*, supra] . . . did not define precisely all circumstances warranting an apportionment: Daily's Est., 323 Pa. 42, 46, 186 A. 754." While *Fisher's Estate*, supra, involved the distribution of the proceeds from a sale of stock, the crux of that case is similar in posture and merit to appellant's contention. In that case, the device of corporate merger was used to obviate the necessity of paying past accumulated and unpaid preferred dividends and to reduce the preferred rate from 7% to 5%. The trust estate held 7% preferred stock in a steel company which had both the 7% preferred and common stock outstanding. In order " 'to take care of accumulated dividends on the 7% preferred stock' ", 344 Pa. at 609, 26 A. 2d at 194, the company merged with its principal subsidiary, and for each of the common shares in the old company of $100 par

the holders received one share of common in the new merged company with no par but a stated value of $25. And each of the 7% preferred shares in the old company was exchanged for 1.4 shares of 5% preferred stock (each of $100 par) in the new merged company. The court there held that the life tenant was entitled to an apportionment of the sale price on the basis of the reorganization, recognizing that part of the increased, realized value of the shares sold by the trust estate was attributable to the cancellation of accumulated and unpaid dividends on the preferred shares.

While the court in *Fisher's Estate,* supra, used the sale as the "occasion for an apportionment", we think that Luella L. Reznor should equally have received an apportionment in 1938 of that portion of the new common shares which represented the accumulated and unpaid preferred dividends and the future right to receive the annual rate on the shares which the trustee held as intact value after the 1928 transaction, if any. *Daily's Estate,* 323 Pa. 42, 186 A. 754 (1936), where the trustee held shares of the Diamond Match Co. of Illinois, is relevant in this regard. All the assets of that company were transferred to a new Maryland company in return for all of its stock. And all of the stock of the Maryland company was transferred to a new Delaware (holding) company, whose stock was taken in return and distributed to the holders of the Illinois company. Thereafter, the Illinois company dissolved and cancelled its stock. In that situation, the Court held that an apportionment was necessary. While the facts are not quite apposite, the following language is relevant, 323 Pa. at 48, 186 A. at 756: "Had the life estate ended when the transfer was completed there can be no doubt as to the division to be made. That the trust received stock makes no difference. There must be apportioned to the trust estate that number of shares . . ., the total book value of which would equal the intact

value at the time of the inception of the trust. The remainder of such stock must go to the life tenant." See also, *Earp's Appeal,* supra note 2; but cf., *King Estate,* 349 Pa. 27, 36 A. 2d 504 (1944).

Common sense dictates that some apportionment should have been made in 1938 (assuming without decision, of course, that a certain portion of the shares distributed as a dividend in 1928 should have been retained in the corpus to maintain the intact value) when the trustee received one share of new common for each share of 7% preferred, and one share of new common only for each nine shares of old common which he held. In accepting such a transaction, the trustee was dealing with two sets of vested rights, to wit, the right of the remaindermen to have the corpus intact and the right of the life tenant to receive the dividends due her under the contract evidenced by the share certificates. In regard to this realignment of ownership, the sole witness in this case (here speaking in his capacity as Company officer) stated that the Board of Directors was "taking into consideration the cumulated dividends that were unpaid, taking into consideration the prior right of the preferred stockholders to both assets and earnings. I mean, not only taking into consideration the past but taking into consideration the future, because once the exchange was made then all stockholders were on the same basis." The cases dealing with common shares and anticipated but undeclared dividends from accumulated earnings are quite different and distinct from the situation where preferred dividends have accrued without payment. True it is that the holders have no vested right in the surplus or other assets of a corporation, but such is not the case with the holders of preferred shares with cumulated and unpaid dividends from a going concern. As stated in *Daily's Estate,* 323 Pa. at 47, 186 A. at 756: ". . . the corporate management could not defeat the life tenant's right to

a share in the earnings by the circuitous method of re-incorporation here adopted." Neither should the life tenant's right here have been abrogated by a reorganization of the Company's capital structure. Granted there was no surplus from which to pay these accumulated dividends, but the holders of the common shares agreed to a reduction in their interest in the Company's capital in order to meet the obligation to these preferred shareholders, and "to be relieved of a very unrealistic dividend rate of 7% for the future". Cf. *Fisher's Estate*, supra. Thus, it is our conclusion that the transactions of 1928 and 1938 represented apportionable events, the mathematical determination of which must be decided below upon remand.

Considering *Catherwood Trust*, supra, to be controlling, the court below failed to elaborate upon "other observations" which it made and which require discussion here.

First, it is stated that the 9 to 1 ratio in the 1938 recapitalization adjusted the indebtedness due the trust, and that the life tenant profited by the higher dividends thereby secured. But that is like saying that half a loaf is better than *one*. If the life tenant was entitled to the entire amount attributable to unpaid dividends, should she have been required to be satisfied with the added income resultant from the "reinvestment" of those dividends? To ask the question is to suggest its answer.

Second, the court below states that Luella, being one of the parties "originally and primarily interested in the dividend distribution", accepted the cash dividends without challenge as the only ones to which she was entitled for 20 years, and that she (her estate) cannot now complain. In the first place, the settlor was the one "originally" interested, not the beneficiary. And if anyone's intent controls, it is his: *Pew Trust*, 411 Pa. 96, 191 A. 2d 399 (1963), and cases cited there-

in. Furthermore, this vernacular definition of laches or estoppel cannot stand the test of precedent or reason. No one relied to his detriment upon the failure of the trustee to make proper distributions of the "dividends", nor is anyone seeking to penalize the trustee for his failure to so do. The life tenant having failed to claim the dividends in her lifetime, her executrix is not estopped from receiving them after her death: *Schulz Estate*, 374 Pa. 459, 98 A. 2d 176 (1953), and *Martin's Estate*, 280 Pa. 573, 124 A. 738 (1924). See also, Restatement 2d, Trusts §219, comment g. No hardship will result to the trustee if the provisions of the trust are enforced. The assets are all available, and the only question is to whom shall they go. That the life tenant should not be barred by her inaction is further evidenced by the family relationship between her and the trustee (who was, at the time of these disputed transactions, the life tenant's brother-in-law—the settlor's brother), which compels a conclusion that she relied upon his good services. Still further, she was receiving handsome cash dividends throughout the years, and probably never felt a pressing need to assert her rights (if, in fact, she knew about them—a proposition highly doubtful in view of the admitted confusion regarding the rules of apportionment which pervaded even practicing attorneys and the bench of that day).

Third, the conclusion is supported by the wording of the will, which directed that dividends be "paid", not that dividends be "distributed". This proposition is belied by the wording of the whole paragraph of the will: "I direct that the *stock* in the [Company] . . . be *paid* to . . . Trustee for my wife, Luella Reznor and the *dividends* from the same shall . . . be *paid* to Luella Reznor . . . ." (Emphasis supplied.) Thus, no inference can be drawn from the direction that dividends be "paid", that only cash dividends were to be so treated.

And fourth, there was no history of stock dividends in the Company, and therefore the settlor did not intend to deal with them in his will. However, the clear direction of the will is to pay dividends, with no distinction as to whether they be stock or cash. In view of such a clear direction, we need not struggle hard to glean a contrary intent which would have had the effect of depriving the settlor's wife (the natural object of his bounty) of her right to the dividends, as, when and however they were declared and paid by the Company.

Having determined these questions preliminarily then, the remainder of this discussion must be focused upon the Principal and Income Act of 1947, supra, and the constitutionality of its retroactive application to the transactions of 1928 and 1938.

Section 15 of the Principal and Income Act of 1947, supra, 20 P.S. §3470.15 provides: "The provisions of this act . . . shall apply . . . to all wills, trust agreements and trust relations theretofore or thereafter made or created [referring to the date of enactment]. . . . And, provided further, That the provisions of this act *shall not apply to receipts . . . received . . .* prior to the effective date of this act." (Emphasis supplied.) While it is true that the Act does not supply a definition of the term "receipts", as used elsewhere[3] in the Act, the term clearly includes the distribution of stock dividends.

Both *Norvell Estate,* 415 Pa. 427, 203 A. 2d 538 (1964), and *Catherwood Trust,* supra, clearly, unequivocally and correctly declared and established that the rules promulgated by the Principal and Income Act, supra, did, and permissibly could, constitutionally ap-

---

[3] 20 P.S. §3470.3(1) provides: "All *receipts* of money or *other property,* paid or delivered as . . . *corporate distributions* deemed to be income under section 5 . . . shall be deemed income, unless otherwise expressly provided in this act." (Emphasis supplied.)

ply to stock dividends declared upon shares held pursuant to trust agreements created prior to the enactment thereof. Counsel for appellant does not attempt, and we do not presume, to attack the wisdom, clarity and correctness of those decisions.

Nevertheless and notwithstanding the correctness of those decisions, they are not here applicable. In each of those cases, the question for decision was the application of the Principal and Income Act, supra, to corporate actions which took place after the effective date of the Act.[4] In the present case, the question for decision is the retroactive application of these statutory rules to dividends declared *and paid* prior to the codification. The latest transaction with which we are concerned occurred in 1938, some 17 years prior to the passage of the first Principal and Income Act.

It is true that *Catherwood Trust,* supra, 405 Pa. at 78, 173 A. 2d at 94, contains the statement that, *"in all audits now pending and henceforth,* distributions shall be made under the provisions of the Principal and Income Act of 1947." (Footnote omitted.) (Emphasis in original.) And, insofar as the audits are concerned with corporate distributions occurring after the effective date[5] of that Act, that holding is specifically reaffirmed. However, it is clear that the *Catherwood* case was not concerned with, and did not presume to decide, whether the Act's provisions were applicable to distributions made prior to its enactment which the

---

[4] In *Norvell Estate,* 415 Pa. at 429, 203 A. 2d at 539, footnote 3, it is, stated: ". . . [S]ince all the stock dividends . . . *occurred after the enactment* of the Principal and Income Act, the statutory rules classifying such receipts as principal was [sic] held to govern this transaction." (Emphasis supplied.) And in *Catherwood Trust,* supra, all the dividends were declared between the years 1948 and 1956.

[5] Act of July 3, 1947, P. L. 1283, 20 .P.S. §3470.15: "The provisions of this act shall become effective upon the enactment thereof . . . ."

trustee either neglected or refused to allocate according to the rules extant at the date of the distribution.

The very language used to support the result in *Catherwood Trust,* supra, is relevant and conclusive in the present case for the opposite result (i.e., the unconstitutionality of a retroactive application to the present transactions). "Certain principles of law are beyond dispute: (1) a gift of an equitable life .estate in income or of an estate in remainder does constitute a grant of a vested property right of which the recipients cannot be divested by legislative action; (2) a vested property right cannot exist in a rule of law, although a rule of law may establish a vested property right; (3) where an interest is declared vested by this Court, such interest cannot be altered or extinguished by the retroactive effect of any statute." 405 Pa. at 71-72, 173 A. 2d at 91.

It is clear, and no one disputes, that Luella L. Reznor had a vested property right in 1918 by virtue of the Last Will and Testament of Claud L. Reznor, to wit, a right to receive the "dividends" from 16 particular shares of the Company for her life. Cf. *Crawford Estate,* 362 Pa. 458, 67 A. 2d 124 (1949). She did not have a vested right in the rule of law known as the Pennsylvania Rule of Apportionment, nor in its definition of income or dividends: See, *Norvell Estate,* supra. However, she did have a vested right to all property which was legally hers under the existing rules of law, as interpreted by this Court. And those rights are to be determined by the law (both statutory and decisional) extant at the respective times of the corporate distributions. That law (see discussion above) declared that Luella L. Reznor had a right to an apportionment both in 1928 and 1938. Those rights to the "income", as represented by the distributions, became vested in each respective year, and the retroactive application of a future statute could not constitutionally extinguish

them: *Catherwood Trust*, supra; *Crawford Estate*, supra; Amendment XIV, §1, Constitution of the United States; and, Article I, §1, Constitution of Pennsylvania. Cf. *Hessenbruch Estate*, 26 Pa. D. & C. 2d 64 (1961), and *Pew Estate*, 63 York 181 (1948), aff'd on other grounds, 362 Pa. 468, 67 A. 2d 129 (1949). Furthermore, the proviso to §15 of the Principal and Income Act, quoted above, does not even assume to apply to "receipts . . . received . . . prior to the effective date of this act." See, *King Estate*, 355 Pa. 64, 48 A. 2d 858 (1946). And, as stated in the Statutory Construction Act, Act of May 28, 1937, P. L. 1019, §56, 46 P.S. §556: "No law shall be construed to be retroactive unless clearly and manifestly so intended by the Legislature."

We therefore conclude that the apportionments to which Luella Reznor was entitled in 1928 and 1938 are barred neither by the passage of time nor by the application of the statutory rules. Nor is her estate to be precluded from asserting these rights in the present case.

Decree reversed; the record is remanded with directions to proceed according to the standard herein set forth. Each party to pay own costs.

Mr. Chief Justice BELL dissents.