Tyler Trusts.

Argued January 15, 1971. Before BELL, C. J., JONES, EAGEN, O'BRIEN, ROBERTS, POMEROY and BARBIERI, JJ.

*Oscar M. Hansen,* with him *William T. Dyer, Richard P. Brown, Jr., John Russell, Jr.,* and *Morgan, Lewis & Bockius,* for appellants.

*Samuel S. Logan, Jr., Maurice Heckscher, Montgomery, McCracken, Walker & Rhoads,* and *Duane, Morris & Heckscher,* for appellee.

*Richard B. Klein,* for appellee.

OPINION BY MR. CHIEF JUSTICE JONES, March 27, 1972:

These appeals, which stem from two inter vivos trusts created by Sidney F. Tyler (settlor), present questions of apportionment between principal and income of certain corporate stock distributions, shares of stock acquired by exercise of stock subscription rights, proceeds of sales of stock subscription rights,

their accretions and proceeds thereof and the proceeds of sales of stock allocated to principal by the trustee.

On May 30, 1917, the settlor created, and subsequently funded, a revocable inter vivos trust wherein settlor was the named income beneficiary during his lifetime and, upon his death, his children were to receive the income during their lives. By an amendment dated April 5, 1932, the settlor relinquished his life interest in favor of his children and made the trust irrevocable. Prior to settlor's death on June 3, 1935, he created a second irrevocable trust on December 15, 1933.

Following the 1932 amendment to the 1917 trust the pertinent provisions in both trusts were identical:[1] the net income was payable one-half to his son and one-half to his daughter for their respective lives; upon the death of either of settlor's children, it was provided that such child's share of income should be paid *per stirpes* to his or her descendants for twenty-one years after the death of the last survivor of settlor's descendants living at the date of the deeds of trust; upon the termination of the trusts, the settlor directed that the principal should be distributed in equal shares to settlor's grandchildren then living and to the descendants then living of settlor's deceased grandchildren *per stirpes*.

Settlor's son died leaving three children all of full age and sui juris.[2] The appellant—settlor's daughter—died during the pendency of these appeals leaving four children all of full age and sui juris, and appellant's personal representatives have been substituted (appellants). The trustee filed its first account on May 2,

---

[1] The 1917 trust, unlike the 1933 trust, provided for annuities to two persons upon settlor's death. Both annuitants are deceased and those annuities have no effect on our decision.

[2] One child died during the pendency of these appeals.

1967, for judicial adjudication of the rights of the respective parties and a division of the trusts. By decree of the Orphans' Court Division of the Court of Common Pleas of Philadelphia dated December 10, 1968, the corpus of each trust was divided in half between appellants' decedent's line and her brother's line.[3] Appellants challenged the trustee's account by filing a claim for allocation and this litigation commenced. The auditing judge confirmed both accounts, *see, Tyler Trust*, 48 Pa. D. & C. 2d 437 (C.P. Phila. 1969), for the reported adjudication of the 1917 trust, and appellants filed exceptions. After argument before the court en banc, the exceptions were dismissed and the adjudication of the auditing judge was confirmed absolutely.[4] Appeals having been taken from decrees of the court below, we have consolidated both appeals for purposes of brevity.

Initially, we will examine the law in this area before any recitation of other pertinent facts. Such examination begins with a discussion of the so-called Pennsylvania Rule of Apportionment (hereinafter "Rule"). Beginning with this Court's decision in *Earp's Appeal*, 28 Pa. 368 (1857), upon the occurrence of an "apportionable event"—(1) the distribution by a corporation of an extraordinary cash or stock dividend; (2) the liquidation of the corporation; (3) the sale of the stock by the trustee; and (4) the issuance of stock rights[5]—an allocation was made between income beneficiaries and remaindermen depending upon the source of the item in question. *See, generally,* Bo-

---

[3] That decree further subdivided the corpus of the brother's trust into three separate trusts for his children.

[4] *See Tyler Trust*, 20 Fid. Rep. 232, 48 Pa. D. & C. 2d 459 (C.P. Phila. 1970), for the reported opinion of the court en banc concerning the 1917 trust.

[5] *E.g., Cunningham Estate*, 395 Pa. 1, 149 A. 2d 72 (1959); *Buist's Estate*, 297 Pa. 537, 147 Atl. 606 (1929).

gert, Trusts and Trustees §847 (2d ed. 1962); 3 Scott on Trusts §236.3 (3d ed. 1967); Restatement (First) of Trusts §236 (1935); Brigham, *Pennsylvania Rules Governing the Allocation of Receipts Derived by Trustees from Shares of Stock*, 85 U. Pa. L. Rev. 358 (1937); Note, 83 U. Pa. L. Rev. 773 (1935). The Rule was not applied specifically to *ordinary*[6] stock dividends payable at the rate of 6% or less, these dividends being allocated to income.

When dealing with stock dividends in excess of 6%, an apportionment was made between the life tenant and remainder interests in order to preserve the "intact value" of the trust investment. *Flinn's Estate*, 320 Pa. 15, 181 Atl. 492 (1935); *Flinn's Estate*, 310 Pa. 206, 165 Atl. 31 (1932); *Baird's Estate*, 299 Pa. 39, 148 Atl. 907 (1930); *Packer's Estate (No. 1)*, 291 Pa. 194, 139 Atl. 867 (1927); *Nirdlinger's Estate*, 290 Pa. 457, 139 Atl. 202 (1927). Contrary to the weight of authority in other jurisdictions which adopted the

---

[6] The oft-quoted definition of an ordinary dividend (cash or stock) is that contained in comment c to Section 236 of the Restatement (Second) of Trusts (1959): "Whether a dividend is an ordinary or an extraordinary dividend depends upon all the circumstances of the case. Among the circumstances which may be of importance in determining whether a dividend is an ordinary dividend are the following: (1) whether similar dividends have been declared with regularity in the past; (2) whether such dividends are regularly paid out of current earnings; (3) the frequency with which such dividends are declared; (4) the size of the dividend in relation to the market value of the shares at the time of the creation of the trust; (5) the designation, if any, placed upon it by the directors of the corporation; (6) the source of the earnings from which the distribution is made." *See, also, Given's Estate*, 323 Pa. 456, 461, 185 Atl. 778, 780 (1936); *Opperman's Estate (No. 1)*, 319 Pa. 455, 464, 179 Atl. 729, 734 (1935); *Nirdlinger's Estate*, 290 Pa. 457, 139 Atl. 200 (1927); *Earp's Appeal*, 28 Pa. 368, 375 (1857).

On the other hand, an extraordinary dividend (cash or stock) has been defined as a dividend which is unusual in form and amount and paid at irregular intervals. *Nirdlinger's Estate, supra.*

Rule, 3 Scott on Trusts §236.12 (3d ed. 1967), this Court required an apportionment of the proceeds derived from a sale of stock between principal and income so as to preserve for principal the intact value of the investment and gave the excess to the life tenant as income. *Nirdlinger's Estate,* 290 Pa. at 475-76, 139 Atl. at 208. Because the issuance of stock rights was an "apportionable event" under the Rule, when shares were acquired by the exercise of stock subscription rights, a portion of those shares was allotted to principal in order to maintain the "intact value" of the stock and the balance was awarded to the income beneficiary. *Hostetter's Trust,* 319 Pa. 572, 181 Atl. 567 (1935); *Jones v. Integrity Trust Co.,* 292 Pa. 149, 140 Atl. 862 (1928). "Proceeds arising from the sale of stock rights should be distributed in the same manner . . . as in the sale of stock. They are a species of stock." *Waterhouse's Estate,* 308 Pa. 422, 429-30, 162 Atl. 295, 297 (1932). *See, also, Bard's Estate,* 339 Pa. 433, 13 A. 2d 711 (1940). *See, generally,* 3 Scott on Trusts §236.9 (3d ed. 1967).

While the Rule, based on the source of the dividend rather than the form (Massachusetts Rule) or date (Kentucky Rule) of the dividend, was adopted by a majority of jurisdictions in the United States, *see,* Annot., 24 A.L.R. 9 (1923), and acclaimed by the First Restatement of Trusts, the complexity of modern corporate structure, *see,* Cohan & Dean, *Legal, Tax and Accounting Aspects of Fiduciary Apportionment of Stock Proceeds: The Non-Statutory Pennsylvania Rules,* 106 U. Pa. L. Rev. 157 (1957), led to the rejection by the National Conference of Commissioners on Uniform State Laws of the Rule in favor of the uncomplicated Massachusetts version. *See,* Uniform Principal and Income Act §§1-17 (1931). *See, also,* Restatement of Trusts §236(b) (Supp. 1948). Finally,

the General Assembly of this Commonwealth enacted the Uniform Principal and Income Act which had been promulgated by the National Conference of Commissioners on Uniform State Laws. Uniform Principal and Income Act of 1945, Act of May 3, 1945, P. L. 416, §1 *et seq.* Although repealed, that legislation was substantially re-enacted by the Principal and Income Act of 1947, Act of July 3, 1947, P. L. 1283, §1 *et seq.*[7]

The provisions of the 1947 Act pertinent to our consideration of these appeals are Sections 2, 3(2), 5(1), 5(2) and 15:

"Section 2. Application of the Act; Powers of Settlor.—This act shall govern the ascertainment of income and principal . . . between tenants and remaindermen in all cases where a principal has been established with . . . the interposition of a trust: Provided, That the person establishing the principal may himself direct the manner of ascertainment of income and principal . . . or grant discretion to the trustee or other person, to do so and such provision and direction, where not otherwise contrary to law, shall control, notwithstanding this act.

"Section 3. Income and Principal; Disposition.—

. . .

"(2) All receipts of money . . . paid or delivered as the consideration for the sale . . . of property forming a part of the principal . . . shall be deemed principal, unless otherwise expressly provided in this act. Any profit or loss, resulting from any change in form of principal, shall enure to or fall upon principal, unless otherwise expressly provided in this act.

. . .

---

[7] While our opinion will often refer to the current (1947) Act, it should be realized that similar principles are applicable under the 1945 Act and that the cut-off point is May 3, 1945, when the question is whether the Rule or the Principal and Income Act applies.

"Section 5. Corporate Dividends and Share Right.—

"(1) All dividends on shares of a corporation, forming a part of the principal, which are payable in the shares of the corporation itself of the same kind and rank as the shares on which such dividend is paid shall be deemed principal.

. . .

"(2) All rights to subscribe to the shares . . . of a corporation, accruing on account of the ownership of shares . . . in such corporation, and the proceeds of any sale of such rights shall be deemed principal.

. . .

"Section 15. Time of Taking Effect.—The provisions of this act shall become effective upon the enactment thereof, and shall apply to all estates of tenants or remaindermen and to all . . . trust agreements and trust relations theretofore or thereafter made or created . . . : And, provided further, That the provisions of this act shall not apply to receipts and expenses received or paid prior to the effective date of this act."

The crucial import of these statutes is the allocation of all stock dividends, ordinary or extraordinary, proceeds of sale and stock rights, to principal *unless the settlor directs otherwise.*

Notwithstanding the General Assembly's valiant attempt to simplify the apportionment morass, this Court delivered a crippling blow to this laudatory legislation in *Crawford Estate,* 362 Pa. 458, 67 A. 2d 124 (1949), and *Pew Trust,* 362 Pa. 468, 67 A. 2d 129 (1949), by holding that the 1945 and 1947 Acts could not constitutionally receive a retroactive application to post-enactment receipts in pre-enactment trusts. *See, also, Warden Trust,* 382 Pa. 311, 115 A. 2d 159 (1955). Twelve years later in *Catherwood Trust,* 405 Pa. 61, 173 A. 2d 86 (1961), we came to the opposite conclu-

sion and overruled the trilogy of cases, prospectively abolished the Rule and retroactively applied the 1947 Act to trusts theretofore created in which audits were presently pending.[8]  *See,* 7 Vill. L. Rev. 497 (1962). *See, also,* Annot., 69 A.L.R. 2d 1137 (1960). In subsequent cases we, specifically, have reaffirmed the teaching of *Catherwood* and rejected constitutional challenges to the retroactive application of the Principal and Income Act to trusts created prior to the effective date of that legislation.  *Arrott Estate,* 421 Pa. 275, 217 A. 2d 741 (1966); *Norvell Estate,* 415 Pa. 427, 203 A. 2d 538 (1964), *cert. denied,* 380 U.S. 913 (1965).

As noted earlier, the Rule has continuing vitality: notwithstanding the pendency of an audit, Section 17 of the 1945 Act and Section 15 of the 1947 Act provided that corporate distributions *received* prior to May 3, 1945, will be apportioned under the Rule. *Reznor's Estate,* 419 Pa. 188, 213 A. 2d 791 (1965). *See, generally,* 39 Temple L. Q. 400 (1966). Accordingly, as of the date of our decision in *Catherwood,* it was settled that all stock dividends, ordinary or extraordinary, distributed after the effective dates of the 1945 and 1947 Acts were to be allocated to principal in the absence of a contrary direction by the settlor.

What was thus settled by *Catherwood* became partly unsettled by *Pew Trust,* 411 Pa. 96, 191 A. 2d 399 (1963). Despite the clear language of Section 5(1) of the 1945 and 1947 Acts—"*All* dividends on shares of a corporation, forming a part of the principal, which are payable in the shares of the corporation itself of the same kind and rank as the shares on which such dividend is paid shall be deemed principal" (Emphasis added)—this Court held in *Pew* that ordinary stock

---

[8] For a discussion whether an audit was pending, *see Brown Estate,* 408 Pa. 214, 183 A. 2d 307 (1962).

dividends of 6% or less received in a pre-1945 trust were allocable to income even though the dividends were received *after* the effective dates of the 1945 and 1947 statutes.[9] The opinion of the Court purported to restrict the holding of *Catherwood* to "extraordinary stock dividends and . . . proceeds of sales of stock" and to exclude it from application to "ordinary stock dividends." 411 Pa. at 102-105, 191 A. 2d at 403-404. Our later decisions in *Hallowell Trust,* 432 Pa. 184, 246 A. 2d 684 (1968), and *Darlington Trust,* 434 Pa. 198, 252 A. 2d 611 (1969), repudiate this limitation of *Catherwood* and reaffirm that in *all* trusts, regardless of when created, *all* receipts—including, but not limited to, both ordinary and extraordinary stock dividends—accruing after the effective dates of the 1945 and 1947 Acts are allocable in accordance with the provisions of those acts in the absence of a contrary direction by the settlor.

In its opinion on exceptions the court below characterized *Pew* as "sui generis" and intimated that it should no longer be followed as a precedent. Since lower courts have made awards, and trustees have undoubtedly made voluntary distributions, in reliance on *Pew,* we shall set things straight by simply limiting hereafter the force of *Pew* as a precedent to its alternative holding as summarized in the second-from-last paragraph of the opinion of the Court.[10] *See,* Restatement (Second) of Trusts §236, comment 5 (1959) ; 37 Temple

---

[9] It was the position of the present writer that *Pew* was wrongly decided. *See,* 411 Pa. at 110-120, 191 A. 2d at 407-412 (dissenting opinion).

[10] "(2) it is especially clear that in the light of the facts and circumstances which surrounded Mrs. Pew at the time she created the trust, she gave and intended to give to her grandson, Arthur E. Pew, Jr., the life tenant of this trust, the small stock dividends of 6% or less, as well as the cash dividends which were paid annually, or as often as possible, to the owners of the common stock of the Sun Oil Company." 411 Pa. at 109-110, 191 A. 2d at 406-407.

L.Q. 104 (1963); 112 U. Pa. L. Rev. 290 (1963); 9 Vill. L. Rev. 179 (1963); Fiduciary Review, June, 1963.

Thus, up until September 30, 1963, the law should have been, and is now, that extraordinary stock dividends received prior to the new effective date of the 1945 legislation must be apportioned between the income beneficiaries and remaindermen in accordance with the Rule, while ordinary dividends of 6% or less received before 1945 are awarded to income; after 1945, both ordinary and extraordinary stock dividends are allocated to principal in the absence of a contrary direction by the settlor. *See, Dunham Trust,* 433 Pa. 273, 249 A. 2d 531 (1969); *McEldowney Estate,* 415 Pa. 87, 202 A. 2d 100 (1964).

On August 1, 1963, the General Assembly amended the Principal and Income Act of 1947, effective September 30, 1963, and provided that stock dividends of 6% or less received after that date shall be deemed income unless the settlor directs otherwise:

"Section 5. Corporate Dividends and Share Rights.

"(1) Corporate distributions made to a trustee in the shares of the distributing corporation, however described or designated by the distributing corporation, shall be deemed principal, but if the number of shares of any class distributed to shareholders of such class is six percent (6%) or less of the number of shares of that class outstanding on the record date for such distribution, the shares so distributed shall be deemed income."

Before addressing the specific issues presented by these appeals, we must consider also the statute against accumulations. *See, generally,* Note, 43 Temple L. Q. 1 (1969). Under the Act of April 18, 1853, P. L. 503, §9,[11] the General Assembly attempted to prevent the

---

[11] The Pennsylvania accumulation statute was modeled upon the Thelluson Act, 39 & 40 Geo. III, C. 98 (1800).

disproportionate growth of estates through the accumulation of income and made it unlawful for a settlor to direct the accumulation of "rents, issues, interest or profits [income] . . . for any longer term than the life or lives of any such . . . settlor . . . and the term of twenty-one years from the death of any such . . . settlor." Contrary to Chief Judge (later Justice) CARDOZO's opinion in *Equitable Trust Co. v. Prentice,* 250 N.Y. 1, 164 N.E. 723 (1928), this Court held in *Maris's Estate,* 301 Pa. 20, 151 Atl. 577 (1930), that if certain stock dividends are deemed income as a matter of law under the Rule, they must be treated as income notwithstanding the settlor's direction that all stock dividends be considered principal because otherwise there would be a violation of the accumulations statute: "no one can be permitted to set aside the public policy of the State by the simple expedient of designating by another name that which the courts have repeatedly decided to be income." 301 Pa. at 23, 151 Atl. at 578. *See, also, Wentz's Estate,* 12 Pa. D. & C. 398 (O.C. Mont. 1928). *See, generally,* Note, 44 Corn. L. Q. 284 (1959); 79 U. Pa. L. Rev. 336 (1931). Perhaps in response to *Maris, see, Hallowell Trust,* 432 Pa. at 193, 246 A. 2d at 688, the General Assembly in 1939 partially repealed the 1853 Act and provided, henceforth, that a settlor's direction to allocate *extraordinary* stock dividends to principal is enforceable. [12] Since the 1939

---

[12] "In wills, deeds of trust, or other instruments creating trusts, becoming effective hereafter, provisions directing that extraordinary dividends declared upon corporate stock held in trust, whether payable in cash, stock, rights to subscribe to stock of the issuing or another corporation, or otherwise, or directing that profits realized from such stock, either upon its sale or upon the sale or dissolution of the issuing corporation, or otherwise, shall be treated, in whole or in part, either as principal or income, shall be valid and enforceable."

Act as well as the subsequent statutes[13] concerning accumulations, unlike the Principal and Income Acts of 1945 and 1947, do not, by their own language,[14] apply to trusts theretofore created, we need only refer to the 1853 Act for our discussion of these pre-1939 trusts.

In light of the fact that Section 2 of the Principal and Income Act of 1947 permits the settlor of a trust, whenever created, to direct the ascertainment and apportionment of income and principal, the continued validity of *Maris* was collaterally questioned in *Hallowell* and directly contested in *Darlington*. Both opinions reaffirmed *Maris* and established a scheme relating to the interaction of the various apportionment rules and the accumulations statute.

As far as presently pertinent, *Darlington* followed and applied the principles of *Maris* in the situation where stock dividends are generated by the corpus of a pre-1939 trust and received before May 3, 1945: if the settlor directs that stock dividends otherwise allocable to income under the Rule should be awarded to principal, that direction is invalidated by the accumulations statute. *Hallowell* held that ordinary and ex-

---

[13] The Estates Act of 1947, Act of April 24, 1947, P. L. 100, §6(8)(a), re-enacted the principle of the 1939 Act: "Apportionment between principal and income. The following directions or authorizations shall be valid: a. To apply to principal in whole or in part extraordinary dividends regardless of the form in which they are paid, and rights to subscribe to stock. . . ." By an amendment to the Estates Act, Act of February 17, 1956, P. L. (1955) 1073, §3, 20 P.S. §301.6 (Supp. 1971), income accumulations were permitted for the perpetuities period.

[14] Section 1 of the 1939 Act refers to trusts "becoming effective hereafter." Both Section 21 of the Estates Act of 1947, Act of April 24, 1947, P. L. 100, §21, and Section 5 of the Act of February 17, 1956, P. L. (1955) 1073, §5, 20 P.S. §301.22 (Supp. 1971) provide: "As to conveyances effective before [January 1, 1948, or April 1, 1956], the existing laws shall remain in full force and effect."

traordinary stock dividends generated by the corpus of a pre-1939 trust and received between 1945 and 1963 must be treated as principal in the absence of a contrary direction under the Principal and Income Acts; if the settlor directs that stock dividends be awarded to principal, his direction coincides with the statutory mandate and there is no violation of the 1853 Act, which never prohibited the accumulation of principal. Lastly, *Darlington* held that stock dividends of 6% or less generated by the corpus of a pre-1939 trust and received after 1963 are considered income in the absence of a contrary direction by the settlor; but if the settlor directed the allocation of such dividends to principal, thereby accumulating that which would otherwise be income, this direction is valid and the rationale of *Maris* is inapplicable since the Principal and Income Act of 1947 not only permits the settlor to make such allocation but also repeals any other acts, including Section 9 of the 1853 Act, which are inconsistent.

Bearing these principles in mind, we next turn to the crux of these appeals: did the settlor direct a manner of allocation? Specifically, we must interpret the settlor's language in paragraph seven of the 1917 trust which is identical to his language in paragraph six of the 1933 trust: "SEVENTH: Full discretion, power and authority is hereby given to the said Trustee to take and pay for out of the principal of the trust estate, all allotments of bonds, stock or stock dividends which it as the holder of bonds or stock forming part of the trust estate shall have the right to take, and to borrow money when in its judgment necessary for the proper execution of this power, and *all allotments of bonds, stock or stock dividends shall be treated and regarded as belonging to the principal of the trust estate and not as income.*" (Emphasis added) As indicated by our italics, the pivotal question concerns the

definition of "allotments." The construction urged by appellants, and rejected by the court below, is that only those stock dividends paid for from principal should be retained in principal and all other stock dividends should be allocated to income in accordance with the law applicable at the date of receipt. The court below construed this language as a direction that *all* stock dividends should be awarded to principal.

In conjunction with an earlier paragraph[15] giving broad powers of investment to the trustee, the first portion of the above quoted paragraph authorizing the trustee "to take and pay for out of the principal of the trust estate, all allotments of . . . stock dividends" provides the initial step of appellants' argument. On this point, appellants cite several dictionaries, cases and textbooks that were popular when these trusts were created to demonstrate that the term "allotment" was used in connection with stock subscriptions. Therefore, appellants contend that settlor, by this language, only intended to cover the hybrid situation where stock dividends *had to be paid for*: only those stock dividends that were paid for out of principal should remain in principal; by implication, all other stock dividends received without payment therefor should be awarded to the income beneficiaries.

Although the appellants' theory might have some degree of logic to command it, we believe it is too nar-

---

[15] The sixth paragraph of the 1917 trust, which is identical to the fifth paragraph of the 1933 trust, pertinently provides: "Sixth: The said Trustee is hereby further authorized and empowered to invest and reinvest all or any part of the trust estate in such property, real and personal, shares, bonds and other securities whatsoever as to it shall seem proper, and to subscribe to any shares, bonds or securities, whether the same are or are not such investments as are by law defined or construed to be proper investments for trust funds, and in no event shall it be limited to the class of investments known as legal securities."

row a construction for a variety of reasons. In the first place, the words "all allotments" mean "all allotments" and not just those that are paid for. *Cf. Biddle Appeal,* 390 Pa. 460, 466, 135 A. 2d 915, 918 (1957). Secondly, appellants collaterally argue that a construction of this language as a direction to allocate all stock dividends to principal results in a violation of the accumulations statute and thereby contravenes a decided preference for a construction resulting in a lawful disposition, *e.g., Renner Estate,* 358 Pa. 409, 413, 57 A. 2d 836, 838 (1948). This contention is not persuasive since *Maris,* which first held that the accumulation of stock dividends transgresses the accumulations statute, was not decided until thirteen years after settlor first used this language. Thirdly, it seems most strange that the settlor and scrivener of these elaborate trusts would only direct the allocation of a rare, hybrid stock dividend which must be paid for and ignore the garden-variety stock dividend which has generated the most litigation in the area of apportionment. Lastly, even if we were to accept the appellants' argument that only "paid for" stock dividends should be awarded to principal, it does not follow that all other stock dividends are allocable to income; in the absence of an *express* direction by the settlor, allocation is made in accordance with the apportionment rules then in effect. On balance, we agree with the court en banc that, "[t]he word 'allotment' is merely synonymous with 'distribution' or 'allocation.'" We believe that settlor intended and directed that all stock dividends, ordinary or extraordinary, paid for or not paid for, "shall be treated and regarded as belonging to the principal of the trust estate and not as income."

Coupling our previous discussion of the law in this area with our construction and interpretation of settlor's language, we will now treat the various, cor-

porate transactions involved in these trusts. For the sake of simplicity and efficiency, we shall divide our opinion into four time periods reflecting the apportionment rules then in effect.

Receipts[16] from April 3, 1932, the Date Settlor Relinquished his Interest in the 1917 Trust, and June 3, 1935, the Date of Settlor's Death, their Accretions and the Proceeds Thereof

During this period we are solely concerned with the 1917 trust which received stock dividends of 6% or less and proceeds of sales of stock.

Under the law that prevailed during this interval, we must turn to the Rule to ascertain the appellants' interest in these receipts. While ordinary dividends of 6% or less were always allocated to income, since the Rule did not apply, we have interpreted paragraph seven of the 1917 trust as a direction to treat all stock dividends as principal. Since the accumulations statute did not prohibit the accumulation of income during the life of a settlor, it is not now applicable. Accordingly, these stock dividends must remain in principal in accordance with the settlor's direction. Following the rationale of *Nirdlinger's Estate,* the proceeds derived from the sales of stock must be apportioned between principal and income so as to preserve the "intact value" of the investment for principal and award the excess to income.

Receipts from June 3, 1935, to May 3, 1945, the Effective Date of the Act of 1945, their Accretions and the Proceeds Thereof

During this period, the 1917 trust received stock dividends of 6% or less and proceeds of sales of stock;

---

[16] The various items included in principal and claimed by the life tenant will be referred to collectively as "receipts."

the 1933 trust received shares acquired by exercise of stock subscription rights and proceeds of stock subscription rights.

While our discussion in the preceding section of the allocation of proceeds from sales of stock is applicable to the proceeds derived by the 1917 trust from sales of stock during this interval, our treatment of the stock dividends of 6% or less received by the 1917 trust is entirely different. Because these dividends are allocable to income, compliance with the settlor's direction to allocate all stock dividends to principal results in an accumulation of income beyond the life of the settlor, which is a violation of the 1853 Act. In line with the teaching of *Maris* and *Darlington,* these dividends are allocable to income.

Turning to those shares/proceeds received by the 1933 trust through the exercise/sale of stock subscription rights, we must again follow the Rule: *Hostetter* governs the apportionment of the shares acquired by the exercise of stock subscription rights and *Waterhouse* covers the proceeds arising from the sale of stock subscription rights.

### Receipts after May 3, 1945, and Prior to September 30, 1963, the Effective Date of the 1963 Amendment, their Accretions and the Proceeds Thereof

During this period both trusts received stock dividends of 6% or less, proceeds of sales of stock subscription rights and proceeds of sale of stock; in addition, the 1917 trust received stock dividends in excess of 6% and shares acquired by exercise of stock subscription rights.

In view of our restriction of *Pew,* the language of the trusts involved in these appeals and the Acts of 1945 and 1947, *all* stock dividends received by either

trust during this period, whether or not in excess of 6%, ordinary or extraordinary, must remain in principal. Under *Hallowell*, there are no problems with the accumulations statute. The shares/proceeds received by the trusts through the exercise/sale of stock subscription rights, in the absence of any contrary provision in the deeds, must remain in principal in accordance with Section 5(2) of the 1945 and 1947 Acts: "All rights to subscribe to the shares . . . of a corporation, accruing on account of the ownership of shares . . . in such corporation, and the proceeds of any sale of such rights shall be deemed principal." The proceeds of sales of stock, in the absence of any contrary direction in the trusts, must remain in principal in accordance with Section 3(2) of the 1945 and 1947 Acts: "All receipts of money . . . paid or delivered as the consideration for the sale . . . of property, forming a part of the principal . . . shall be deemed principal. . . ."

Receipts after September 30, 1963

During this period, both trusts received stock dividends of 6% or less and proceeds of sales of stock; in addition, the 1917 trust received shares acquired by exercise of stock subscription rights and proceeds of sales of stock subscription rights.

With the exception of stock dividends of 6% or less received by both trusts after September 30, 1963, our discussion and treatment of the receipts during the preceding period applies with equal force. The stock dividends of 6% or less would be allocable to income in the absence of a contrary direction. In light of *Darlington*, the settlor's direction does not violate the accumulations statute and these dividends must remain in principal.

The last issue presented by these appeals has not been heretofore considered by our Court. During the

administration of the trusts, the trustee improperly[17] retained some receipts in principal that should have been treated as income and, in some instances, a portion of the trusts' total shares of these corporations issuing "income" stock dividends was later sold. The issue thus presented is whether the shares that were sold should be deemed "income" shares or "principal" shares.

In *Frick Estate,* 4 Pa. D. & C. 2d 247 (O.C. Allegheny 1955), shares were sold by a sole corporate trustee without any authorization by the income beneficiary and the identical issue was presented. It was there held that all sales must be considered to be sales of "principal" shares since the trustee had no authority to sell the property of the life tenant. Although somewhat analogous, it was held in *Ball Estate,* 36 Pa. D. & C. 2d 698 (O.C. Phila. 1965), that the estate of the deceased life tenant was estopped from claiming such shares since the life tenant, also a co-trustee, voluntarily placed them in principal where they did not belong.

Without relying on *Ball* and declining to follow *Frick,* the court below held that "these items should be distributed pro rata, [footnote omitted] except that in the case of the sale of a small stock dividend or rights to subscribe to stock promptly after the event, the proceeds thereof are to be allocated to income." 20 Fid. Rep. at 243, 48 Pa. D. & C. 2d at 469-70. The court en banc advanced four reasons for this conclusion.

First, the income beneficiaries never objected for thirty-five years despite the fact that periodic statements were distributed by the trustee. In light of our

---

[17] There is no evidence of record indicating willful misallocation by the trustee. In view of the overabundance of confusion in this area of the law, we will not attach any significance to the trustee's mistakes.

rejection of a similar argument in *Reznor Estate*, 419 Pa. at 197-98, 213 A. 2d at 796, we reject this reason. *See, also, Stotesbury Estate*, 387 Pa. 591, 128 A. 2d 587 (1957). The second argument by the court below that the trustee believed these receipts to be principal is not supported by any evidence of record. The third basis for this decision was the difficulty of unscrambling these transactions. While this argument has some merit, it is countered by the fact that appellants have already completed the necessary calculations. Nor are we persuaded by the last contention that the formula adopted by the court below would also apply to the apportionment of losses in the value of stock after distribution thereof as stock dividends.

On balance, we are in agreement with *Frick* that where, as in the instant appeals, the trustee had no authority to sell shares belonging to the income beneficiary, the trustee must be deemed to have first sold those shares which were properly retained in principal and, thereafter, those shares belonging to income. A contrary result would be most incongruous where the necessary "tracing" has already been completed.

The decrees, as modified, are affirmed. Costs on estate.

Mr. Justice EAGEN and Mr. Justice ROBERTS concur in the result.

The former Mr. Chief Justice BELL and the former Mr. Justice BARBIERI took no part in the decision of this case.