## Wasserman Estate

*Louis E. Levy,* for the accountants and for income beneficiaries.

*Joseph Parks,* p.p., guardian and trustee ad litem.

KLEIN, A. J., May 17, 1972.—The reason for filing the present account is the resignations of Edith Stix Wasserman and Lionel F. Levy as cotrustees. The trust continues for the benefit of the life tenants.

By Item Fifth of his will, testator directed that the residue of his estate be held in trust for 20 years after the death of the last survivor of his wife, his children and such of his grandchildren and spouses of his children as were living at his death, to pay out of income an annuity of $30,000 per annum to his wife for life, and to pay the balance of any undistributed income, and upon the death of his wife, to pay the entire income in equal shares to testator's living children per stirpes, with further dispositive provisions not necessary to recite for the purposes of this adjudication. The present income beneficiaries are testator's widow,

Edith Stix Wasserman, and the four children of the marriage.

All parties in interest are stated to have received notice of this audit.

The resignations of Edith Stix Wasserman and Lionel F. Levy as cotrustees are evidenced by appropriate writings dated November 15, 1971. Pursuant to the provisions of Item Sixteenth of the will, Lionel F. Levy, by writing dated November 14, 1971, annexed hereto, appointed Louis E. Levy as his successor trustee. This appointment meets the requirements of the will and is accordingly approved.

Evidence of payment of Pennsylvania inheritance tax of $38,627.13 on November 27, 1940, was submitted to the auditing judge.

By decree of this court dated January 20, 1972, Joseph Parks, Esq., was appointed guardian ad litem for minors and trustee ad litem for all unborn and unascertained interests. Mr. Parks filed a written report in which he discussed at length the effect of Item Tenth of the will on the allocation of stock dividends, stock rights and capital gains realized on the sale of stock.

Item Tenth of the will provides:

"*Tenth.* If any corporation in which I am a stockholder at the time of my death, or the stock of which at any time forms a part of my estate, shall declare a dividend, either regular or extraordinary, either from earnings, accumulations, reserves, or otherwise, and whether the same was done before or after my death, and irrespective of the form in which the same may be declared and paid, including dividends declared before my death but payable thereafter, I direct that such dividend shall be considered as income, and shall be distributed accordingly.

"If any of said corporations shall issue rights to

subscribe to additional stock, or if, in the sale of any stock, a price would be realized greater than the inventory value of the same at the time of my death, or at a price greater than the purchase price if purchased after my death, I direct that my executors and trustees, in their sole discretion, shall determine whether the same or any of them shall be considered as income hereunder, or as an increase in the *corpus* thereof, and shall be distributed among the life tenants and the remaindermen as they see fit, and an entry upon the books shall be conclusive upon all parties in interest. This latter provision shall likewise apply in connection with the sale of any real estate of which I may die seized and possessed, or which may be acquired after my death, so that profits therefrom may be applied as principal or income. Any action taken in one particular case, however, shall not act as a precedent in other cases, but my executors and trustees shall use their absolute discretion in every case, and as the situation occurs."

The accountants and the guardian-trustee ad litem are in agreement that no apportionments of stock rights or other corporate distributions prior to May 3, 1945, the effective date of the Pennsylvania Principal and Income Act of July 3, 1947, P. L. 1283, are involved in the present accounting.

The trustees have exercised the discretion granted them in Item Tenth of the will, supra, by retaining in principal all rights to subscribe to shares of stock received since May 3, 1945, and all gains on sales of stock. Mr. Parks makes no objection to these allocations. Since there appears to be no abuse of the trustees' discretion, all such transactions are approved.

In his report, Mr. Parks notes that 42 receipts, designated as "stock dividends," appear in the account. Of these the trustees transferred 29 to income and the

income beneficiaries now claim the remaining 13, plus accretions or the proceeds where shares of stock have been sold. Mr. Parks and the trustees are in agreement that Item Tenth of the will is clear in its direction that all such dividends belong to income. Mr. Levy, as counsel for the trustees and for all of the life tenants, and Mr. Parks have accordingly entered into a stipulation of fact dated February 9, 1972, annexed hereto, which summarizes, inter alia, the transfers now required to be made to income to give effect to the claim of the income beneficiaries as follows:

"4. THAT the following transfers should be made from Principal to income, being stock dividends or the proceeds thereof.

| Name of Stock | To Income | |
|---|---|---|
| AMBAC | $ 1,179.36 | |
| Bank of America | 12,662.50 | |
| Colorado Fuel & Iron | 88.63 | |
| Fluor Corp., Ltd. | 11,810.10 | |
| Unilever | 9,019.02 | |
| American Electric Power Co. | 10.25 | 390 shares |
| Texaco | 2,141.36 | " |

Inasmuch as all parties in interest are agreed on these computations, the cash and shares of stock as itemized above will be awarded to income.

Not listed in paragraph four of the stipulation, supra, but included among the stock distributions previously transferred to income by the trustees, are two 100 percent distributions identified in Mr. Parks' report as made by Texaco, Inc., on June 22, 1951 (transferred to income April 28, 1954) and by Gulf Oil Company on August 10, 1951 (transferred to in-

come June 4, 1952). A second Texaco, Inc., 100 percent stock distribution, made on June 20, 1956, was not transferred to income.

The question has been submitted for adjudication whether these three distributions, as well as three other stock distributions hereinafter described, come within testator's direction in Item Tenth of the will that any ". . . *dividend,* either regular or extraordinary, either from earnings, accumulations, reserves, or otherwise . . . and irrespective of the form in which the same may be declared and paid . . . shall be considered as *income,* and shall be distributed accordingly." (Italics supplied.) The six distributions in question are described in paragraph five of the stipulation as follows:

"6/22/51    200 shs Texas Company, 100% stock dividend supported by a transfer from surplus earnings to capital of 61.4%

"8/10/ 51    550 shs Gulf Oil Corporation, 100% stock dividend, supported by a transfer from surplus earnings to capital of 74.2%

"6/ 20/ 56    200 shs Texas Company supported by a transfer from surplus earnings to capital of 99.6%

"8/8/51    900 shs Standard Oil New Jersey par 25 exchanged for 1800 shs par 15 supported by a transfer from surplus earnings to capital of 1.25%

"3/27/56    1600 shs Standard Oil New Jersey par 15 exchanged for 4800 shs par 7 supported by a transfer from surplus earnings to capital of 7.08%

"6/27/56    2500 shs American Gas and Electric Co., par 5 for 3750 shs par 10 supported by a transfer from surplus earnings to capital of 61.9% "

The amount each company transferred from its earned surplus account and its capital surplus ac-

count to support their respective distributions is shown in the stipulation as follows:

| | | *"On a Per Shares Basis* | | |
| | | From Earned Surplus | From Capital Surplus | Percentage of Dividend Supported by Transfer From Earned Surplus |
| Date | Name | | | |
| --- | --- | --- | --- | --- |
| 6/22/51 | Texaco | $15.35 | $9.65 | 61.40% |
| 6/20/56 | Texaco | 24.91 | 0.09 | 99.60 |
| 8/8/51 | Standard Oil, N.J. | .06 | 4.94 | 1.25 |
| 3/27/56 | Standard Oil, N.J. | .42 | 5.58 | 7.08 |
| 8/10/51 | Gulf Oil | 18.55 | 6.45 | 74.2 |
| 6/27/56 | American Gas and Electric | 6.19 | 3.81 | 61.90" |

The distributions are variously designated in the account as stock dividends, stock splits, or stock exchanges, but the terminology used is not significant for the purposes of this discussion. It is well settled that the designation by the corporation or the accountant as to the nature of the transaction has no bearing on and does not fix the rights between income beneficiaries and remainderman: Nirdlinger's Estate, 290 Pa. 457 (1927); Fownes Trust, 5 Fiduc. Rep. 239 (1955).

Section 2 of the Principal and Income Act of 1947 authorizes a testator to direct the manner of ascertainment of income and principal or to grant discretion to the trustee to do so. Furthermore, it now appears to be settled that the 1947 Act may be applied

retroactively to post-enactment receipts in pre-enactment trusts: Catherwood Trust, 405 Pa. 61 (1961); Norvell Estate, 415 Pa. 427 (1964), cert. denied, 380 U.S. 913 (1965); Arrott Estate, 421 Pa. 275 (1966); Tyler Estate, 447 Pa. 40 (1972).

Reams have been written concerning the three apportionment rules adopted by the various States in this country. One of the best dissertations on the subject can be found in Nirdlinger's Estate, supra, in which Mr. Justice (later Chief Justice) Kephart, in a scholarly opinion, reviewed at length the Massachusetts, Kentucky and Pennsylvania rules. The compelling reason for the adoption of these rules was to make certain that in long continuing trusts, the life tenants, who are usually the favored objects of the testator's bounty, should not be required to starve while remote, unascertained remaindermen, often unknown to the donor, ultimately feast. See Nirdlinger's Estate (No. 2), 327 Pa. 171 (1937). There has never been any restriction on the extent of gifts to income beneficiaries. A testator has always had the right to give all or any part of his estate to persons of his choice subject to the rights of his surviving spouse and creditors.

In the recent case of Tyler Estate, supra, Chief Justice Jones carefully reviewed the somewhat chaotic history of the rules in Pennsylvania governing the allocation of distributions derived from shares of stock. With regard to the Principal and Income Act of 1947 he concluded that "the crucial import of [the Act] is the allocation of all stock dividends, ordinary or extraordinary, proceeds of sale and stock rights, to principal *unless the settlor* [or testator] *directs otherwise.*"

Accordingly, in the present case, testator's broad directions favoring the income beneficiaries are

unimpeachable. Chief Justice Bell of the Pennsylvania Supreme Court, in Fleck Estate, 406 Pa. 363 (1962), stated the legal principles involved as follows, at pages 367-368:

"When a testator expresses his intention that certain corporate transactions or certain fiduciary transactions or that certain property received by his fiduciary shall be treated as income, his intent of course prevails, and as to these transactions and receipts the old Pennsylvania Rule of Apportionment and the 'Principal and Income Act of 1947' have no application: cf. Jones Estate, 377 Pa. 473, 105 A. 2d 353; Cunningham Estate, 395 Pa. 1, 149 A. 2d 72; Buist's Estate, 297 Pa. 537, 147 A. 606; Waterhouse's Estate, 308 Pa. 422, 162 A. 295; Crawford Estate, 362 Pa. 458, 67 A. 2d 124; Ferguson Trust, 354 Pa. 367, 47 A. 2d 245; Act of July 3, 1947, Section 2, P. L. 1283, 20 PS §3470.2."

We conclude, therefore, that if these distributions are dividends within the meaning of Item Tenth of the will, they belong to the life tenants. The language used by testator to define "dividend" is extremely broad. He said a dividend is to be considered as income if it is ". . . regular or extraordinary, either from earnings, accumulations, reserves, or otherwise, . . . and irrespective of the form in which the same may be declared and paid . . ."

The complexities of present-day corporate financing have created a vast spectrum of varied forms of distributions to stockholders, including, inter alia, cash and stock dividends, stock rights and stock splits. Our present concern is to determine when a distribution of shares of stock constitutes a stock dividend within the meaning of Item Tenth of the will and when such distribution is a stock split. It is clear that a fundamental difference exists between a stock dividend and a stock split. In Pew Trust, 398 Pa. 523, 529

(1960), Mr. Justice (now Chief Justice) Jones makes the distinction as follows:

"A substantial and conclusive difference exists between a 'stock split' and a 'stock dividend': in the former, a division of the shares of stock, not of the earnings or profits of the corporation, takes place without any change in or impingement upon the then existing status on the corporate books of the earned surplus and capital accounts; in the latter, an addition of shares of stock and a division of, at least, some of the earnings or profits of the corporation take place, such division being reflected on the corporate books by an irreversible allocation of corporate funds from the earned surplus to the capital account."

If the rules of apportionment applicable to cases involving stock dividends and stock splits were to depend upon the *amount* or *percentage* of earned surplus used in the transaction, it would tend to perpetuate uncertainty. Certainty of application is of the utmost importance. In the present case, the Texaco transaction of June 20, 1956, was supported by a transfer of 99.6 percentum from earned surplus, whereas the Standard Oil of New Jersey transaction of August 8, 1951, involved only 1.25 percentum from earned surplus. Where should the courts draw the line? Should we examine each case separately to determine what percentage of earned surplus must be transferred in order to draw a distinction between a stock split and a stock dividend? We think not. As the court found in Pew, the achievement of certainty dictates that whenever *any* earned surplus is transferred, the transaction is a stock dividend. Only when there is absolutely no change in the financial structure of the corporation is the distribution of new shares to be regarded as a stock split.

For a similar analysis in another jurisdiction see

In re Hormann's Estate, In re Guggenheimer's Estate, 3 App. Div. 2d 5, 157 N.Y.S. 2d 704 (1956), and an extensive note thereon in 42 Cornell L. Q. 595 (1957).

We hold, therefore, that the stock distributions we are considering were not stock splits and that the all-inclusive language used by the testator requires they be paid to the income beneficiaries.

Mr. Parks, as guardian-trustee ad litem representing contingent remaindermen, has reluctantly come to the same conclusion. Accordingly, there will be awarded to income the shares of stock and cash which the parties have agreed upon in paragraph 16 of the stipulation as follows:

| "Name of Stock | Cash | Shares |
|---|---|---|
| American Elec. | $ 6,021.46 | 2,723.33 |
| Texaco | 23,554.96 | |
| Standard Oil of N.J. | 6,811.09 | 4,000.00" |